In the
# United States Court of Appeals
for the Ninth Circuit

UNITED STATES OF AMERICA,
Appellee,

v.

MARINA R. MERINO and ROBERT A. GLAZER, M.D.,
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
District Court No. 2:14-00329 (Hon. Otis D. Wright II)

**BRIEF FOR THE UNITED STATES**

BRIAN C. RABBITT
Acting Assistant Attorney General

EMILY Z. CULBERTSON
ROBYN N. PULLIO
CLAIRE YAN
Trial Attorneys
Fraud Section, Criminal Division

KIRBY A. HELLER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1263
Washington, D.C. 20530
(202) 307-0085
kirby.heller@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................v

JURISDICTIONAL STATEMENT.............................................. 1

CUSTODIAL STATUS.................................................................. 1

STATEMENT OF THE ISSUES .................................................. 1

STATEMENT OF THE CASE...................................................... 3

    A.    Procedural History.............................................. 3

    B.    Statement of the Facts........................................ 3

        1.    The Medicare system .............................. 4

        2.    The fraud scheme .................................... 6

        3.    Investigators interview Glazer and Merino ............. 13

        4.    The trial ................................................... 15

SUMMARY OF ARGUMENT .................................................... 18

ARGUMENT ............................................................................... 25

    I.    The Evidence Was Sufficient To Support Merino's Convictions. ........................................................ 25

    A.    Standard of review.......................................... 25

    B.    The evidence sufficiently established that Merino conspired to defraud Medicare and committed health care fraud ................................................... 26

        1.    The conspiracy count.............................. 28

        2.    The substantive health care fraud counts................ 33

i

3.     Merino's specific arguments to the contrary lack merit ................................................................... 34

II.    There Was No Constructive Amendment of the Indictment....... 37

    A.    Background ............................................................. 38

    B.    Standard of review ................................................ 39

    C.    Argument ............................................................... 39

III.   The District Court Did Not Commit Reversible Error In Instructing The Jury. ..................................................................... 43

    A.    Standard of review ................................................ 43

    B.    The district court did not abuse its discretion in instructing the jury on deliberate ignorance ...................... 44

    C.    The district court correctly instructed the jury on the meaning of the statutory term "willfully" ......................... 46

    D.    The court properly instructed the jury on *Pinkerton* liability ................................................................... 49

    E.    Any error in the court's instruction on intent to defraud was harmless ...................................................... 51

IV.   There Was No Prosecutorial Misconduct Warranting Reversal. ................................................................................. 52

    A.    Background ............................................................. 53

    B.    Standard of review ................................................ 56

    C.    The prosecutors did not plainly commit misconduct ......... 56

V.    The District Court's Method of Designating Alternate Jurors Is Not Reversible Error. ......................................................... 64

    A.    Background ............................................................. 65

B.   Standard of review ......................................................... 66

C.   The court's error in designating the alternate jurors was harmless ............................................................... 66

VI.   The District Court's Questions And Comments During Trial Did Not Constitute Judicial Misconduct, Much Less Plain Error. ................................................................................ 70

A.   Standard of review ......................................................... 70

B.   Glazer has not demonstrated that the judge committed misconduct ................................................................. 71

VII.   The District Court's Evidentiary Rulings Were Not An Abuse Of Discretion. ............................................................. 76

A.   Standard of review ......................................................... 77

B.   The district court did not err, plainly or otherwise, by granting the government's motion in limine to exclude evidence of legitimate medical services ............................ 77

C.   The district court did not abuse its discretion by barring Glazer from testifying from his notes ................... 80

D.   The district court did not abuse its discretion in admitting the "education" letter for a limited purpose ...... 83

E.   The district court did not commit reversible error in admitting portions of the testimony of Investigator Person, Investigator McNulty, and Agent Li .................... 86

F.   The district court did not abuse its discretion by denying Glazer's motion to introduce a Medicare regulation ................................................................... 96

G.   The district court did not abuse its discretion by permitting Agent Li to testify that she did not find "indicators" that signatures were traced ......................... 99

VIII.  Defendants Have Not Shown Cumulative Error Requiring Reversal Of Their Convictions.................................................. 102

IX.  Merino's Within-Guidelines Sentence of 21 Months' Imprisonment Was Procedurally and Substantively Reasonable. ............................................................................... 104

    A.  Background................................................................. 104

    B.  Standard of review..................................................... 106

    C.  The district court did not clearly err in denying Merino credit for acceptance of responsibility ................ 107

    D.  Merino's 21-month term of imprisonment was not procedurally or substantively unreasonable .................... 109

X.  The District Court Did Not Clearly Err In Enhancing Glazer's Offense Level For His Role In The Offense. .............. 113

    A.  Background................................................................. 113

    B.  Standard of review..................................................... 114

    C.  The district court did not clearly err in finding that Glazer was an organizer of the fraud scheme ................. 115

XI.  If This Court Were To Remand For Further Proceedings, Reassignment Is Not Warranted............................................. 119

CONCLUSION.................................................................................... 124

CERTIFICATE OF COMPLIANCE ..................................................... 125

CERTIFICATE OF SERVICE ............................................................. 126

# TABLE OF AUTHORITIES

**Cases**

*Blumenthal v. United States,*
332 U.S. 539 (1947) ............................................................... 35

*Bryan v. United States,*
524 U.S. 184 (1998) ..........................................................47, 48

*Cheek v. United States,*
498 U.S. 192 (1991) ............................................................... 37

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ..........................................................89, 90

*Esperti v. United States,*
406 F.2d 148 (5th Cir. 1969) ................................................. 81

*Evans v. United States,*
504 U.S. 255 (1992) ............................................................... 67

*Gall v. United States,*
552 U.S. 38 (2007) ............................................................... 112

*Herzog v. United States,*
226 F.2d 561 (9th Cir. 1955) ................................................. 79

*Indep. Towers of Wash. v. Washington,*
350 F.3d 925 (9th Cir. 2003) ................................................. 38

*Krechman v. County of Riverside,*
723 F.3d 1104 (9th Cir. 2013)................................25, 120, 123

*Musacchio v. United States,*
136 S. Ct. 709 (2016) ............................................................. 25

*Ortiz v. Yates,*
704 F.3d 1026 (9th Cir. 2012).............................................. 98

*Pinkerton v. United States,*
328 U.S. 640 (1946) ............................................................ 27

*Riley v. Deeds,*
56 F.3d 1117 (9th Cir. 1995) ............................................... 69

*Rosemond v. United States,*
572 U.S. 65 (2014)................................................... 36, 37, 49

*Shaw v. United States,*
137 S. Ct. 462 (2016) ......................................................... 51

*Skilling v. United States,*
561 U.S. 358 (2010)............................................................ 98

*United States v. Acosta-Chavez,*
727 F.3d 903 (9th Cir. 2013) ........................................... 122

*United States v. Adams,*
789 F.3d 713 (7th Cir. 2015) ............................................. 50

*United States v. Aguon,*
851 F.2d 1158 (9th Cir. 1988) (en banc).............................. 67

*United States v. Alcantara-Castillo,*
788 F.3d 1186 (9th Cir. 2015)..................................... passim

*United States v. Alonso,*
48 F.3d 1536 (9th Cir. 1995) ............................................. 94

*United States v. Alvarado,*
838 F.2d 311 (9th Cir. 1987) ............................................. 45

*United States v. Alvarez-Farfan,*
338 F.3d 1043 (9th Cir. 2003)........................................... 100

*United States v. Anchrum,*
590 F.3d 795 (9th Cir. 2009) ........................................91, 92

*United States v. Anieze-Smith,*
770 F. App'x 342 (9th Cir.), *cert. denied*, 140 S. Ct. 613 (2019)............90, 94

*United States v. Antonakeas,*
255 F.3d 714 (9th Cir. 2001) ...................................................................... 39

*United States v. Arreola,*
467 F.3d 1153 (9th Cir. 2006)...................................................................... 40

*United States v. Awad,*
551 F.3d 930 (9th Cir. 2009) ..............................................................44, 47

*United States v. Barson,*
845 F.3d 159 (5th Cir. 2016) ...................................................................... 35

*United States v. Berry,*
258 F.3d 971 (9th Cir. 2001) .................................................................... 114

*United States v. Berzon,*
941 F.2d 8 (1st Cir. 1991).......................................................................... 121

*United States v. Bhagat,*
436 F.3d 1140 (9th Cir. 2006)...................................................................... 38

*United States v. Bingham,*
653 F.3d 983 (9th Cir. 2011) ...................................................................... 50

*United States v. Bishop,*
1 F.3d 910 (9th Cir. 1993) .......................................................................... 76

*United States v. Boykin,*
785 F.3d 1352 (9th Cir. 2015)...............................................................27, 34

*United States v. Brown,*
669 F.3d 10 (1st Cir. 2012).......................................................................... 45

*United States v. Camper,*
66 F.3d 229 (9th Cir. 1995) ...................................................................... 116

*United States v. Cardenas-Mendoza,*
579 F.3d 1024 (9th Cir. 2009)...................................................................... 64

*United States v. Carey,*
589 F.3d 187 (5th Cir. 2009) ...................................................................... 81

*United States v. Chastain*,
  84 F.3d 321 (9th Cir. 1996) ..................................................................... 108

*United States v. Chavis*,
  772 F.2d 100 (5th Cir. 1985) ..................................................................... 84

*United States v. Combs*,
  379 F.3d 564 (9th Cir. 2004) ...................................................... 61, 62, 63

*United States v. Corona-Verbera*,
  509 F.3d 1105 (9th Cir. 2007).................................................................. 35

*United States v. Davis*,
  551 F.2d 233 (8th Cir. 1977) ..................................................................... 81

*United States v. Davis*,
  863 F.3d 894 (D.C. Cir. 2017)................................................................... 37

*United States v. Dearing*,
  504 F.3d 897 (9th Cir. 2007) ..............................................................27, 30

*United States v. Del Toro-Barboza*,
  673 F.3d 1136 (9th Cir. 2012)................................................................... 56

*United States v. Delgado*,
  350 F.3d 520 (6th Cir. 2003) ..................................................................... 68

*United States v. Diaz-Cardenas*,
  351 F.3d 404 (9th Cir. 2003) .................................................................. 108

*United States v. Dixon*,
  901 F.3d 1322 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 854 and 139
  S. Ct. 1392 (2019)................................................................................... 118

*United States v. Dobbs*,
  506 F.2d 445 (5th Cir. 1975) ..................................................................... 79

*United States v. Doe*,
  778 F.3d 814 (9th Cir. 2015) ........................................................ 114, 117

*United States v. Edmond,*
    815 F.3d 1032 (6th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1577 (2017) ............................................... 50

*United States v. Emmett,*
    749 F.3d 817 (9th Cir. 2014) ............................................. 110

*United States v. Fells,*
    78 F.3d 168 (5th Cir. 1996) ...................................... 108, 109

*United States v. Fernandez,*
    388 F.3d 1199 (9th Cir. 2004)..................................... 103, 104

*United States v. Freeman,*
    498 F.3d 893 (9th Cir. 2007) ............................................. 91

*United States v. Gadson,*
    763 F.3d 1189 (9th Cir. 2014)...........................................90, 92

*United States v. Garrison,*
    888 F.3d 1057 (9th Cir. 2018)...........................................26, 30

*United States v. Geston,*
    299 F.3d 1130 (9th Cir. 2002)............................................. 61

*United States v. Graf,*
    610 F.3d 1148 (9th Cir. 2010)............................................. 84

*United States v. Green,*
    940 F.3d 1038 (9th Cir. 2019)........................................... 106

*United States v. Gutierrez-Sanchez,*
    587 F.3d 904 (9th Cir. 2009) ........................................... 112

*United States v. Hankey,*
    203 F.3d 1160 (9th Cir. 2000)............................................. 90

*United States v. Harrison,*
    585 F.3d 1155 (9th Cir. 2009)............................................. 58

*United States v. Hartz,*
458 F.3d 1011 (9th Cir. 2006)........................................................ 39

*United States v. Henderson,*
243 F.3d 1168 (9th Cir. 2001).....................................................48, 49

*United States v. Heredia,*
483 F.3d 913 (9th Cir. 2007) (en banc)....................................... 31, 43, 44

*United States v. Hernandez-Estrada,*
749 F.3d 1154 (9th Cir. 2014) (en banc)................................................ 68

*United States v. Hernandez-Orellana,*
539 F.3d 994 (9th Cir. 2008) ......................................................27, 50

*United States v. Hinkson,*
585 F.3d 1247 (9th Cir. 2009) (en banc)................................................ 114

*United States v. Hinostroza,*
297 F.3d 924 (9th Cir. 2002) ........................................................ 37

*United States v. Holden,*
806 F.3d 1227 (9th Cir. 2015)........................................................ 39

*United States v. Ingham,*
486 F.3d 1068 (9th Cir. 2007)................................................... 117, 118

*United States v. Jenkins,*
785 F.2d 1387 (9th Cir. 1986)................................................... 100, 101

*United States v. Jewell,*
532 F.2d 697 (9th Cir. 1976) (en banc)................................................ 44

*United States v. Johnson,*
735 F.2d 1200 (9th Cir. 1984)........................................................ 94

*United States v. Johnson,*
812 F.3d 757 (9th Cir. 2016) ................................................... 120, 121

*United States v. Johnson,*
875 F.3d 1265 (9th Cir. 2017)........................................................ 96

*United States v. Kincaid-Chauncey*,
556 F.3d 923 (9th Cir. 2006) ...................................................... 98

*United States v. Kowalczky*,
805 F.3d 847 (9th Cir. 2015) .......................................... 123

*United States v. Lane*,
323 F.3d 568 (7th Cir. 2003) ......................................... 79

*United States v. Lindsey*,
634 F.3d 541 (9th Cir. 2011) ......................................... 103

*United States v. Lockett*,
919 F.2d 585 (9th Cir. 1990) ......................................... 94

*United States v. Long*,
301 F.3d 1095 (9th Cir. 2002)........................................ 43

*United States v. Macias*,
789 F.3d 1011 (9th Cir. 2015)................................58, 102

*United States v. Martinez*,
921 F.3d 452 (5th Cir.), *cert. denied*, 140 S. Ct. 571 (2019) ...................30, 41

*United States v. McKinney*,
15 F.3d 849 (9th Cir. 1994) ......................................... 108

*United States v. Meredith*,
685 F.3d 814 (9th Cir. 2012) ......................................... 100

*United States v. Mikhel*,
889 F.3d 1003 (9th Cir. 2018)....................................... 51

*United States v. Miller*,
953 F.3d 1095 (9th Cir. 2020)....................................... 51

*United States v. Mirando*,
768 F. App'x 596 (9th Cir. 2019)................................. 52

*United States v. Moreland*,
622 F.3d 1147 (9th Cir. 2010)....................................... 64

*United States v. Morgan,*
  376 F.3d 1002 (9th Cir. 2004)............................................................70, 75

*United States v. Mostella,*
  802 F.2d 358 (9th Cir. 1986) ................................................................. 71

*United States v. Nakai,*
  413 F.3d 1019 (9th Cir. 2005)................................................................ 50

*United States v. Necoechea,*
  986 F.2d 1273 (9th Cir. 1993)............................................................. 102

*United States v. Nevils,*
  598 F.3d 1158 (9th Cir. 2010) (en banc)............................................... 26

*United States v. Noushfar,*
  78 F.3d 1442 (9th Cir. 1996) ...........................................................69, 70

*United States v. Ogba,*
  526 F.3d 214 (5th Cir. 2008) ................................................................. 41

*United States v. Olano,*
  507 U.S. 725 (1993).............................................................................. 66

*United States v. Olano,*
  62 F.3d 1180 (9th Cir. 1995) ................................................................. 67

*United States v. Pham,*
  352 F. App'x 189 (9th Cir. 2009).......................................................35, 47

*United States v. Pinto,*
  48 F.3d 384 (9th Cir. 1995) ................................................................. 119

*United States v. Pisani,*
  773 F.2d 397 (9th Cir. 1985) ................................................................. 75

*United States v. Poland,*
  659 F.2d 884 (9th Cir. 1981) ................................................................. 74

*United States v. Prime,*
  431 F.3d 1147 (9th Cir. 2005).............................................................. 100

*United States v. Ramirez*,
537 F.3d 1075 (9th Cir. 2008)..............................................57, 58, 62, 64

*United States v. Ramos-Atondo*,
732 F.3d 1113 (9th Cir. 2013)........................................................ 33

*United States v. Ray*,
735 F. App'x 290 (9th Cir. 2018) ................................................. 118

*United States v. Reyes*,
660 F.3d 454 (9th Cir. 2011) ......................................................... 56

*United States v. Rivera-Rodriguez*,
489 F.3d 48 (1st Cir. 2007)......................................................... 122

*United States v. Rutgard*,
116 F.3d 1270 (9th Cir. 1997)....................................................... 80

*United States v. Scott*,
642 F.3d 791 (9th Cir. 2011) ................................................. passim

*United States v. Scrivener*,
189 F.3d 944 (9th Cir. 1999) ...................................................... 106

*United States v. Seifer*,
800 F.3d 328 (7th Cir. 2015) ...................................................67, 68

*United States v. Shaw*,
885 F.3d 1217 (9th Cir.), *cert. denied*, 139 S. Ct. 350 (2018) ...................... 52

*United States v. Shvets*,
631 F. App'x 91 (3d Cir. 2015)...................................................... 48

*United States v. Sine*,
493 F.3d 1021 (9th Cir. 2007)....................................................... 85

*United States v. Soto-Barraza*,
947 F.3d 1111 (9th Cir. 2020)....................................................... 39

*United States v. Spaar*,
748 F.2d 1249 (8th Cir. 1984)...................................................... 101

*United States v. Sternstein,*
    596 F.2d 528 (2d Cir. 1979)................................................................ 79

*United States v. Sullivan,*
    522 F.3d 967 (9th Cir. 2008) ............................................................. 30

*United States v. Tcherniavsky,*
    708 F. App'x 444 (9th Cir. 2018) ....................................................... 94

*United States v. Thomas,*
    134 F.3d 975 (9th Cir. 1998) ............................................................. 79

*United States v. Thornhill,*
    940 F.3d 1114 (9th Cir. 2019)............................................................ 77

*United States v. Torralba-Mendia,*
    784 F.3d 652 (9th Cir. 2015) ................................................. 77, 91, 92

*United States v. Trigg,*
    988 F.2d 1008 (9th Cir. 1993).......................................................... 66

*United States v. Valencia-Barragan,*
    608 F.3d 1103 (9th Cir. 2010).................................................. 106, 112

*United States v. Vasquez-Perez,*
    742 F.3d 896 (9th Cir. 2014) .......................................................... 110

*United States v. Vega,*
    585 F. App'x 618 (9th Cir. 2014)..................................................67, 68

*United States v. Vera,*
    770 F.3d 1232 (9th Cir. 2014)........................................................91, 92

*United States v. Walter-Eze,*
    869 F.3d 891 (9th Cir. 2017) ................................................ 32, 43, 44

*United States v. Ward,*
    747 F.3d 1184 (9th Cir. 2014)............................................................ 39

*United States v. Weatherspoon,*
    410 F.3d 1142 (9th Cir. 2005)............................................................ 58

*United States v. Whitfield,*
590 F.3d 325 (5th Cir. 2009) ...................................................... 79

*United States v. Wilkes,*
662 F.3d 524 (9th Cir. 2011) ...........................................63, 103

*United States v. Wilson,*
16 F.3d 1027 (9th Cir. 1994) ...................................................... 71

*United States v. Woodson,*
526 F.2d 550 (9th Cir. 1975) .................................................... 100

*United States v. Woolem,*
765 F. App'x 358 (9th Cir. 2019) ............................................. 57

*United States v. Wright,*
625 F.3d 583 (9th Cir. 2010) .................................................... 25

*Weeks v. Angelone,*
528 U.S. 225 (2000) .................................................................. 85

**Statutes**

18 U.S.C. § 2 ............................................................................ 27

18 U.S.C. § 1347 ............................................................. passim

18 U.S.C. § 1349 ...........................................................1, 3, 26

18 U.S.C. § 3231 ........................................................................ 1

18 U.S.C. § 3553 ................................... 106, 109, 110, 112

18 U.S.C. § 3742 ........................................................................ 1

26 U.S.C. § 7206 .................................................................... 37

28 U.S.C. § 1291 ........................................................................ 1

42 U.S.C. § 1320a-7b................................................................ 40

Fed. R. App. P. 4 ...................................................................... 1

Fed. R. Crim. P. 24 ....................................................................... 20, 66, 67

Fed. R. Crim. P. 52 .............................................................................. 67

Fed. R. Evid. 106 ................................................................................. 70

Fed. R. Evid. 403 ................................................................................. 85

Fed. R. Evid. 612 ................................................................................. 81

Fed. R. Evid. 702 ................................................................................. 90

U.S.S.G. § 3B1.1 .......................................................................... passim

U.S.S.G. § 3E1.1 .............................................................. 104, 107, 108

**Other Authorities**

16AA Wright & Miller, *Federal Practice and Procedure* § 3974.5 (4th
  ed.) ................................................................................................ 45

3 Mueller & Kirkpatrick, *Federal Evidence*, § 6:93 (4th ed.) ........................... 81

Ninth Circuit Manual of Modern Criminal Jury Instruction § 8.25 ............... 49

# JURISDICTIONAL STATEMENT

Defendants Marina Merino and Robert Glazer appeal from judgments of conviction and sentence in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. The court entered judgment with respect to Merino on September 12, 2019, ER 1-9, and entered judgment with respect to Glazer on October 21, 2019, Glazer ER 2-7.[1] Merino and Glazer filed timely notices of appeal on September 12, 2019, and October 23, 2019, respectively. ER 1783; Glazer ER 1; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

# CUSTODIAL STATUS

Merino is out on bail pending appeal. Glazer is incarcerated, with a projected release date of April 27, 2028.

# STATEMENT OF THE ISSUES

1. Whether the evidence was sufficient to support Merino's convictions for conspiracy to commit Medicare fraud, in violation of 18 U.S.C. § 1349 (Count 1), and Medicare fraud, in violation of 18 U.S.C. § 1347 (Counts 10-17).

---

[1] "ER" refers to the Excerpts of Record filed by Merino. "Glazer ER" refers to the Excerpts of Record filed by Glazer. "SER" refers to the government's Supplemental Excerpts of Record. "GX" refers to a government exhibit admitted at trial. "Dkt." refers to a document filed on the district court docket.

2. Whether the government constructively amended the health care fraud charges against Merino by relying on evidence that she was paid to recruit patients.

3. Whether the district court (i) abused its discretion in giving a deliberate ignorance instruction on the knowledge element of health care fraud; (ii) misstated the meaning of the statutory term "willfully"; (iii) abused its discretion in formulating the wording of the *Pinkerton* instruction; or (iv) reversibly erred in defining "intent to defraud."

4. Whether the government committed reversible prosecutorial misconduct when it asked defense witnesses to comment on the veracity of other witnesses.

5. Whether the district court's method of selecting alternate jurors was reversible under plain error review.

6. Whether, on plain error review, the district court's questions and comments during trial projected to the jury an impermissible and prejudicial appearance of advocacy or partiality.

7. Whether the district court abused its discretion or plainly erred in its challenged evidentiary rulings.

8. Whether cumulative errors warrant reversal.

9. Whether Merino's sentence was procedurally and substantively unreasonable.

10. Whether the district court clearly erred in finding that Glazer was an organizer of the fraud scheme.

11. Whether, if this Court were to remand the case for further proceedings, it should be reassigned to a different judge.

## STATEMENT OF THE CASE

### A.    Procedural History

Following a jury trial in the United States District Court for the Central District of California, defendants Merino and Glazer were convicted of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. Merino was also convicted on eight counts of health care fraud, and Glazer was convicted on 12 counts of health care fraud, in violation of 18 U.S.C. § 1347. ER 1; Glazer ER 2. Merino was sentenced to 21 months of imprisonment, to be followed by three years of supervised release. ER 1-2. Glazer was sentenced to 120 months of imprisonment, to be followed by two years of supervised release. Glazer ER 2-3.

### B.    Statement of the Facts

Viewed in the light most favorable to the verdicts, the evidence at trial showed that between approximately 2007 and May 2014, Glazer conspired

with Merino, Angela Avetisyan, Ashot Minasyan, and others to defraud Medicare out of millions of dollars. Glazer was a medical doctor who operated the "Glazer Clinic" at 5250 Santa Monica Boulevard, in Los Angeles, California. ER 248, 392, 396. Avetisyan was his office manager and co-owner, along with Minasyan, of a home health agency ("Fifth Avenue Home Health" or "Fifth Avenue"), which was located in the suite next to Glazer's. ER 392, 399, 1355. Glazer only saw Medicare patients at his clinic, and the patients were recruited by marketers, including Merino and members of her family, who would locate Medicare beneficiaries and offer them gifts to induce them to go to the clinic. *E.g.*, ER 388, 401-02, 405, 516. Following, at most, a cursory examination, Glazer ordered tests, services, and durable medical equipment ("DME") for patients that were unnecessary and often not provided at all. *E.g.*, ER 436-39, 492, 558-60. As a result of Glazer's own fraudulent submissions to Medicare as well as the submissions of the various providers that were based on Glazer's fraudulent orders and referrals, Medicare was defrauded of more than $20 million. SER 30.

### 1. The Medicare system

Medicare is a federal program that provides health care benefits to individuals who are over 65 years old or disabled. ER 243. Medicare Part B covers physician services, including office visits and laboratory tests, as well as

4

DME. ER 296-97. Medicare also reimburses private companies that provide beneficiaries with services such as home health and hospice care. ER 243.

Billed services must be "medically necessary." *E.g.*, ER 243, 255, 307. For a patient to qualify for home health care services, a physician must certify that the patient is "homebound," meaning that "considerable and taxing effort [is required] to get out of the house." ER 291-92; *see also* ER 288-89 ("It's something that is every day for this patient, they cannot get out of their house. And it has to be of such an effect that other assistive devices are not useful for them."). Power wheelchairs are medically necessary for beneficiaries that "cannot move around within their home and perform their activities of daily living without the use of a wheelchair." ER 300. And Medicare covers hospice care for patients "who have been determined to have a life expectancy of less than six months." ER 300-01.

Medicare providers must agree to abide by Medicare rules and regulations, and, by submitting a claim, the provider is certifying that the claim is "accurate, complete, and truthful." ER 283. Medicare does not reimburse claims involving a "patient recruiter," *i.e.*, someone who supplies patients to a clinic, home health care agency, or DME supplier for payment. ER 272-74. Due to the large number of claims, Medicare operates a "trust based system,"

and it reviews only a small fraction of submitted claims. ER 254-55, 310-12, 378.

### 2. The fraud scheme

Glazer's practice was limited to patients with Medicare coverage. ER 388. To drum up business, Avetisyan hired patient recruiters to locate Medicare beneficiaries and bring them to Glazer's office. ER 391-95, 406. Merino, her three daughters, and her husband worked as marketers for the Clinic. ER 401-02, 466-67 (Merino and her family were working as "a team"). The marketers found prospective patients in various ways, including by simply looking for elderly people on the street. ER 407, 516. Merino also had a friend at Social Security who told her "who the people who were getting Medicare were." ER 460. Merino and the other marketers offered the prospective patients gifts, such as orthopedic shoes, food, or electrical appliances to entice them to go to Glazer's clinic for medical services and supplies, and patients were told that "all of that" was for free. ER 407, 442, 486, 638. Threats also were used. *See* ER 897-98 (after "Maria"[2] approached a patient at a restaurant and "insisted" that she take food and a blood pressure machine despite the

---

[2] Merino was known as "Mari," and her name in the transcript and exhibits was spelled "Mary," "Mari," "Maria," and "Mare." *See, e.g.*, ER 400, 402, 514-16, 525; SER 17-18.

patient's rejection, a "younger woman" called the patient and told her that if the patient did not come with her to "go get [her] blood pressure," "they were going to take my [Medicare] benefits away from me").

After identifying Medicare beneficiaries and verifying their eligibility with Glazer's receptionist ("Narine" or "Nara"), Merino and the other marketers transported the patients to Glazer's clinic and, once there, handed the patients' Medicare cards to the receptionist. ER 408-10, 417-18, 420. If the patients turned out to be ineligible for Medicare benefits, they did not see Glazer and were taken home. ER 411-12.

Before the Medicare-eligible patients saw Glazer – indeed, before he even arrived at the clinic – patients received a battery of tests, including blood draws, EKGs, and, in some cases, ultrasounds that were administered by Nara, Avetisyan, and one of Avetisyan's employees at Fifth Avenue. ER 417-18, 421-23; *see* ER 298 (Medicare will not pay for tests that a doctor orders before evaluating a patient because it "specifically doesn't pay for screening services"). Merino stayed with her patients, including in the testing room, because "[s]he didn't want another marketer to steal her patients away." ER 466; ER 531-32 (Merino was "very protective of her patients").

Glazer's so-called "examinations" were superficial, if performed at all. *E.g.*, ER 439 (Glazer saw patients for "[n]o more than 10 minutes"); ER 492

(patient was in Glazer's office for a "short period of time" and he did not examine her or perform any tests); ER 558-60; SER 44 (Glazer conducted "little exam" that lasted "[a]t most" ten minutes and consisted of Glazer's listening to patient's chest and back, and Glazer never examined patient's wife, for whom he had ordered physical therapy and home health care); ER 904 (Glazer did not examine patient or do anything other than "double [her] blood pressure medication"). He saw patients in his office, rather than in an examination room, and often remained behind his desk. ER 432, 437, 492, 903-04. Patient recruiter Zoila O'Brien, who often accompanied her patients into Glazer's office or could see what was happening through the partially open office door, never saw Glazer administer an allergy test, remove ear wax from his patients, or, for that matter, "perform any type of test on a patient," ER 437-38, although he submitted claims for such procedures to Medicare, SER 29.

Glazer also ordered unnecessary services and DME. For example, Glazer prescribed power wheelchairs for beneficiaries who could "walk just fine," ER 436-37, were "completely mobile," ER 594, and could "walk around the neighborhood," ER 659. He also ordered home health care for patients who were active walkers (including patients who could walk up the stairs to Glazer's second-floor office) and who regularly left their homes to run errands,

dine out, and take out-of-town trips. ER 453, 489, 497-98, 659-60, 669-70, 672, 831-32, 846-47, 858-59. And he ordered hospice care for a patient who didn't "have much [health] problems" and who lived for another four years. ER 1016-17.

The patients' medical files documented complaints and conditions that the patients did not have and never discussed with Glazer and included tests that were not administered and services and DME that were never provided. *E.g.*, ER 494-99, 561-68, 649-55, 674-76, 834-37, 849-50, 905-07. More than 100 patient files contained duplicate (or even triplicate) copies of identical EKG print-outs, which contained Glazer's handwritten initials and differed only as to the patient name at the top. ER 962-68; SER 31-41.

After meeting with a patient, Glazer placed his prescriptions in the patient's medical file and handed the file to Nara. ER 439-40. Nara, in turn, photocopied the prescriptions and gave them to Avetisyan to "coordinate" with the company that would provide the prescribed DME or home health care service. ER 440-41, 445. Before they left the clinic, the patients with home health care prescriptions signed forms that were in English and not translated for the Spanish-speaking patients and purportedly documented the number of home health care visits that the patient already had received. ER 446-51.

The patient recruiters were paid only if Medicare paid the claims associated with their patients, and the timing of the recruiters' payments depended on the specific service or item that the patient received. ER 455; *see* ER 455-56 (for power wheelchair patients, recruiters were paid when the patient received the power wheelchair and for home health care patients, they were paid after the nurses visited the patients once or twice). If Medicare denied the claims after the recruiters had been paid, they either had to return the money or bring in a new patient as recompense. ER 455, 473. O'Brien and Merino complained to each other that they "had to wait for Medicare" before getting paid, ER 461, and "would talk about" how "it didn't really work out to bring in the patients because we didn't know whether Medicare was going to pay or not," ER 473.

The recruiters were paid at Avetisyan's office at the Glazer Clinic or at Fifth Avenue. ER 403-05, 456-57. When the distributions took place at the Glazer Clinic, the marketers would wait as Avetisyan called them into her office, one at a time, and she told them what the payments were for. ER 457-58, 461 ("It was for the health care service, for the chair and for the clinic."). Avetisyan also gave them receipts, which would include, for example, "the agency that provided the health care service to the patient." ER 461-62; *see* ER 465 (the receipts included the names of the home health agencies that billed

Medicare for patients that had been seen at the Glazer Clinic). Merino often got paid first and boasted that she was paid more than O'Brien because she "started out with [Avetisyan] from the time [Avetisyan] opened." ER 458-60.

The marketers were paid both by check and in cash. ER 461. Avetisyan sometimes had the cash in her office; other times, she got it from Minasyan or from representatives of other home health care agencies who purchased the Glazer prescriptions from Avetisyan and brought over envelopes with cash. ER 462-66. O'Brien also testified that, on "some occasions," Glazer handed Avetisyan an envelope, and Avetisyan "pulled cash out of the envelope" to pay O'Brien. ER 463-64; *see also* ER 638-69 (it was "clear" to O'Brien that the cash payment was from Glazer). The checks were from "Fifth Avenue Home Health" and "Hollywood PS" (a company that Avetisyan created, SER 4-9). ER 516-17, 639-40. Avetisyan explained to O'Brien that the Hollywood PS checks were from Glazer's office. ER 517, 604-05 (when Avetisyan gave O'Brien a Hollywood PS check, she would say "[t]his check is from Dr. Glazer's office"). Some of the checks included a variation of the word translate in the memo lines. ER 518, 525. Neither Merino nor O'Brien provided translation services, and Avetisyan and Minasyan told the marketers that "they were going to pay us as though we were translators." ER 518-21.

Avetisyan also instructed the marketers to pass out flyers to disguise the true purpose of the kickback payments after Medicare fraud investigators conducted a site visit at the Glazer Clinic and Fifth Avenue in 2012. ER 540. Merino and O'Brien discussed their fear that they would be investigated; Merino said that she would keep the flyers in the car and tell investigators that "all she did was clean" or that "all she did was pass out flyers." ER 541-44.

Avetisyan kept records at Fifth Avenue that documented information about the patients and the recruiter who brought them in. *E.g.*, SER 10-12 (log that shows, among other things, the patient name, Medicare payments, the Medicare claims that were rejected, the marketer's name (including "Mari"), and payments to that marketer); SER 13-14 (list of recruiter's patients to be called to return to Glazer's office with the name "Mary" and "Fifth Avenue" at the top); SER 15 (similar). According to those records, "Mary" (or "Mare") recruited the five patients named in Counts 10 through 17 of the superseding indictment. SER 13-15, 19-20.

During the course of the scheme, Medicare paid the Glazer Clinic $740,820, which accounted for approximately 80% of the funds in Glazer Medical's Citibank account. ER 691, 695; SER 25-26. Glazer transferred more than one third of his total deposits ($267,845) to the Hollywood PS bank account. ER 695; SER 25. Hollywood PS checks, in turn, were used to pay

O'Brien, Merino, and Merino's family members. ER 692; SER 25. On the basis of Glazer's referrals, Medicare paid home health care agencies more than $15 million, with more than $3.3 million going to Fifth Avenue alone. ER 870-71; SER 27, 30. Glazer's referrals also resulted in Medicare payments of about $2.2 million to DME companies and about $2.1 million to hospice care providers. SER 30.

### 3. Investigators interview Glazer and Merino

In 2012, Medicare fraud investigators conducted on-site visits at the Glazer Clinic and Fifth Avenue after data analyses revealed unusual billing patterns, including that 80% of Fifth Avenue's patients were based on Glazer's referrals and that Glazer had a short (or no) history with the patients he referred. ER 752-54, 763-64. When the investigators questioned Glazer, he appeared to have no knowledge of the basic workings of his practice and referred the investigators to his receptionist or to Avetisyan for the answers. *E.g.*, ER 773-75, 799-800, 803-05, 816-19; *see also* ER 301-03 (Glazer billed for bladder emptying procedure but was "visibly uncomfortable" with answering questions about the procedure, "wasn't familiar" with it, "couldn't locate the equipment," and "referred [the investigators] to his office manager, if [the investigators] had any questions").

On May 13, 2014, law enforcement agents executed search warrants at the Glazer Clinic and Fifth Avenue. ER 923-25. Three months later, FBI Special Agent Janine Li interviewed Merino. ER 968. Merino first told the agent, consistent with the cover-up she and her co-conspirators had concocted, that she handed out flyers for the Glazer Clinic to elderly people on the street and occasionally cleaned the office. ER 968-70. She wrote her name on the flyers, and when patients called the clinic, Avetisyan gave her the patients' phone numbers and Merino called and set up appointments for them at the clinic. ER 970-71. Merino also gave three different accounts about whether she drove the patients to the clinic: she first said that she "rarely" drove them; she then said that, if she did drive them, she dropped them off outside the clinic; and she revised her story again to say that "[she] only handed out flyers and set up appointments; [she] did nothing else." ER 971-72. She claimed that she never offered the beneficiaries any items, such as food or the DME listed on the flyers, but that patients could get free items "if they asked for them." ER 972. As to payment, Merino stated that Avetisyan paid her by check; that she was never paid in cash; and that she was not paid "per patient" but instead received $10 an hour for distributing the flyers. ER 973. Agent Li showed Merino some checks with the memo line "trans," and Merino stated that she never translated for Avetisyan. ER 974.

14

### 4. The trial

During the six-day trial, the government presented testimony from 18 witnesses, including co-conspirator O'Brien, several investigators, and 11 Medicare beneficiaries (or their relatives and primary care physicians) for whom claims were submitted to Medicare as charged in the substantive counts in the superseding indictment. The government also introduced more than 100 exhibits, including patients' charts, Medicare and financial records, marketers' logs, and other evidence seized pursuant to the search warrants.

In his defense case, Glazer called several character witnesses as well as his "business manager," Alex Kwechansky, who oversaw Glazer's finances and testified about the unusual financial arrangements between Glazer and Avetisyan. ER 1076, 1078-84, 1087-88. Specifically, he stated that Glazer paid Avetisyan, through her corporation Hollywood PS, for rent, employees' salaries, and "to actually run the office," and that Avetisyan got reimbursed when Medicare paid Glazer. ER 1080-83. There was no set amount for those payments; instead, Kwechansky decided "what [Kwechansky] thought [he] should pay them." ER 1087. To explain the transfer of funds in the other direction, Kwechansky testified that Avetisyan advanced money to Glazer "here and there to keep him in food." ER 1099.

Glazer testified in his own defense. He described his financial arrangements with Avetisyan, explaining that she "apparently had a wealthy boyfriend named Ashot [Minasyan] who offered to pay the rent until [Glazer] started making money with Medicare, and then [Glazer] would pay the rent back to them and payment for the staff." ER 1152. His Medicare business never "built up," however, and he could never take over directly paying the rent and employees' salaries. ER 1152. Instead, when money from Medicare was deposited into the clinic's bank account, he followed Kwechansky's instructions as to how much to transfer to Hollywood PS as reimbursement for the money that Avetisyan had fronted. ER 1155-56. Avetisyan also advanced him "[s]mall amounts of money" to cover his expenses from time to time. ER 1363-64.

Glazer reviewed the files for each of the patients named in the substantive counts and explained why he had ordered the various tests and prescribed the various services. For example, he claimed to have ordered home health care for patients who had high blood pressure or diabetes so that the readings would be accurate. *E.g.*, ER 1202-04, 1208-09, 1231-32, 1270-71, 1327, 1341. He also prescribed power wheelchairs for patients when there was "a danger of falling . . . because, remember, these people break bones and that's how they die." ER 1345; *see also* ER 1181 (testifying that whether a

16

patient could walk was "not a good criteria" because "[w]hat if they have occasional dizzy episodes where they're going to fall and hit their head"). And, Glazer considered patients "homebound" when it was "[d]angerous for the patient to go out without some help because of their various illnesses, which might include diabetes or high blood pressure, heart disease." ER 1347-48.

Glazer testified that Avetisyan or "the front office girl" conducted the bladder emptying procedure and recalled seeing the machine in his office. ER 1257. "[A] girl from a service" did the ultrasounds in his office, and he believed that "they billed Medicare directly." ER 1313. On the other hand, the allergy tests he ordered were done by an outside lab, which, according to Glazer, either billed Medicare directly "or we did and then paid them." ER 1428-29.

Glazer repeatedly denied that he was aware of any fraud at the clinic. *E.g.*, ER 1167-70, 1258, 1273, 1339. He did not know that kickbacks were paid and thought that the marketers merely provided medical transport. *E.g.*, ER 1158, 1167-68, 1273, 1279, 1282.

The jury convicted Glazer on one all but one count of health care fraud.[3] Dkt. 371. It convicted Merino on all counts on which she was charged. Dkt. 373.

**SUMMARY OF ARGUMENT**

1. The evidence sufficiently established Merino's guilt. Merino received illegal payments for recruiting Medicare beneficiaries and transporting them to the Glazer Clinic. A reasonable juror could infer that, when doing so, Merino knew that she was participating in a health care fraud scheme that involved the submission of fraudulent claims to Medicare or that she deliberately failed to investigate the suspicious circumstances taking place around her. Her job was specifically to identify Medicare beneficiaries regardless of their medical condition, and she only got paid if Medicare reimbursed the Medicare provider for the fraudulent claim. She also knew that some of the patients, whom she recruited off the street and were obviously ambulatory, were prescribed home health care and were instructed to sign blank forms documenting, before-the-fact, that they had received the home health care. The checks that she received as payment had false notations to disguise their illegality; she agreed to lie if questioned by investigators about her activities; and she carried out that plan

---

[3] The court granted the government's motion to dismiss Counts 2, 5, and 8. Dkt. 334.

when questioned by an FBI agent. The jury also could find that Merino was guilty of the substantive health care fraud counts under a co-conspirator theory of liability and as an aider and abettor.

2. There was no constructive amendment of the indictment. The superseding indictment charged, as part of the illegal health care fraud scheme, that marketers recruited Medicare beneficiaries and transported them to the Glazer Clinic; the government's proof conformed to the charges; and the district court correctly instructed the jury on the elements of the charged offenses.

3. The district court did not abuse its discretion in instructing the jury on deliberate ignorance. Merino claimed a lack of guilty knowledge, and the evidence supported the inference that she was well aware of a high probability of Medicare fraud and purposely contrived to avoid confirming that knowledge.

The district court's instructions on the meaning of the term "willfully" – that the defendant "committed the act with a bad purpose; that is, with general knowledge that the defendant's conduct was unlawful," ER 1596 – was correct. Contrary to Merino, the term "willfully" in the health care fraud statute does not require the government to prove that a defendant was aware of the specific statute or regulation that she is charged with violating. *See* 18

U.S.C. § 1347(b). The court also correctly instructed the jury on the elements of *Pinkerton* liability.

Any error in the district court's instruction that the jury had to find that the defendant acted with the intent to deceive *or* cheat, rather than deceive *and* cheat, was harmless beyond a reasonable doubt. Merino and Glazer both claimed that they had no knowledge of the fraudulent scheme, and the distinction between "deceive" and "cheat" is irrelevant to that defense. A rational jury also could not have found that defendants intended to deceive Medicare but not to cheat it out of money.

4. Although the prosecutor improperly asked Glazer to comment on the veracity of other witnesses, the errors did not constitute reversible misconduct under plain error review. Glazer cannot show that the error affected his substantial rights because the evidence against him was overwhelming, and, unlike cases in which this Court has found reversible plain error, this case did not boil down to a credibility dispute between Glazer and the testifying patients.

5. The district court violated Fed. R. Crim. P. 24(c) when it designated the alternate jurors before deliberations began, rather than before the evidence was presented, but defendants have not demonstrated that the error prejudiced them. Glazer's contention that the error was structural is unsupported.

6. Glazer has not shown that the district court's conduct during trial constituted reversible judicial misconduct. The court's limited questioning and comments remained well within the court's broad discretion in supervising trials. The court appropriately intervened to clarify the evidence and prevent attorney misstatements. The court's instructions to the jury addressed any appearance of partiality, and the jury's acquittal on one count demonstrates that it was not swayed by the judge's conduct.

7. None of Glazer's evidentiary challenges warrants reversal.

Glazer agreed before trial that evidence that he had provided legitimate medical services to some patients was inadmissible, and the district court did not err, let alone plainly so, in precluding the admission of such evidence.

The district court did not abuse its discretion by not allowing Glazer to testify from notes he had prepared from the patients' files and instead required him to refresh his recollection, if necessary, with the actual files. Moreover, it was clear from his testimony that the notes could not have been correctly used to refresh his recollection because the files themselves did not do so and he would have simply read the notes (as he did the files).

The district court did not abuse its discretion by admitting a letter that the Medicare contractor (SGS) had sent to Glazer in 2010 for the limited purpose of showing that he had been "placed on notice" of certain deficiencies

identified in the letter. ER 1435-36. That notice helped prove that Glazer knew that his conduct violated Medicare regulations, and the court's limiting instruction ensured that the jury did not rely on the contents of the letter for its truth.

The district court was not required to conduct a *Daubert* hearing sua sponte when the government asked Investigator McNulty, an experienced Medicare fraud investigator not formally admitted as an expert, for his understanding of the term "homebound." Glazer also has not demonstrated that the district court plainly erred in failing to give a dual role instruction either when McNulty testified to his understanding of "homebound," or when Investigator Person, primarily an expert witness, briefly described his observations during the SGS site visit. The district court also did not err, plainly or otherwise, by permitting investigators to testify about "red flags" that are indications of health care fraud. This Court has repeatedly affirmed the admission of such modus operandi testimony to help explain how benign facts, when viewed in context, may suggest criminal activity, and the witnesses did not offer any opinions about Glazer's guilt. Nor did the court abuse its discretion in permitting Agent Li to testify briefly about the reasons the agents applied for search warrants for the Glazer Clinic and Fifth Avenue. The court reasonably concluded that, in searching a doctor's office and seizing

confidential files, the agents complied with legal requirements. Although there is a danger that, in describing the steps in their investigation, an agent may testify about out-of-court statements, Agent Li did not do so here.

The district court did not abuse its discretion by denying Glazer's request to admit a Medicare regulation governing the certification requirements for hospice care. The regulation was inadmissible to contradict Investigator Person's testimony about those requirements because the testimony at issue was elicited during cross-examination and the regulation contradicted testimony on a collateral matter.

The district court did not abuse its discretion by permitting Agent Li to testify that, although she found a "light box" at the Fifth Avenue office that could be used to trace signatures, she did not observe any indications in the documents she reviewed that suggested that Glazer's signature had been traced. The court correctly noted that Agent Li's description of the characteristics of traced signatures was a matter of "common knowledge," ER 997, and, even without Agent Li's testimony, the jury could make that determination on its own. The testimony also was insignificant because, as Glazer admitted in summation, the various "Glazer" signatures looked different, undermining the claim that the signatures were traced. Furthermore, even if Glazer's signatures on the prescriptions and orders were not genuine,

Glazer testified that the information in the files was accurate and justified those orders.

8. Defendants' claim of cumulative error fails. This is not the rare case where otherwise harmless errors in the aggregate justify a new trial.

9. Merino's sentence is procedurally and substantively reasonable. Merino was not entitled to a downward adjustment for acceptance of responsibility because she contested her factual guilt at trial. Merino also cannot show that the district court abused its discretion in not adequately accounting for her personal history in light of other relevant sentencing factors and in imposing a sentence at the bottom of the advisory guidelines range.

10. The district court did not clearly err in finding that Glazer was an organizer of the fraud scheme, warranting a four-level adjustment under U.S.S.G. § 3B1.1(a). The evidence at trial established that Glazer helped organize the activities of the participants to carry out the scheme. Although Glazer asserts that the court committed procedural error by referencing Glazer's conduct during in-camera proceedings, the court made the remarks at issue only after it had determined that the four-level enhancement was appropriate and did so in response to Glazer's argument at sentencing that he was not the "shot caller" in the scheme.

11. Glazer has not shown that this case presents the type of "'rare and extraordinary'" circumstance, *Krechman v. County of Riverside*, 723 F.3d 1104, 1112 (9th Cir. 2013), that warrants reassignment to a different judge if the Court were to remand for further proceedings. Glazer relies on the district court's comments about his role in the offense and its aggressive questioning during the trial, but the court's conduct did not demonstrate a personal bias or suggest that it could not be fair upon remand.

## ARGUMENT

**I.    The Evidence Was Sufficient To Support Merino's Convictions.**
(Merino Claim I)

Merino argues (Br. 15-31) that the evidence was insufficient because the government did not prove that she knew that the Glazer Clinic and Fifth Avenue were submitting fraudulent claims to Medicare. A reasonable juror could have found otherwise beyond a reasonable doubt.

### A.    Standard of review

The Court reviews *de novo* challenges to the sufficiency of the evidence. *United States v. Wright*, 625 F.3d 583, 590 (9th Cir. 2010). "Sufficiency review essentially addresses whether the government's case was so lacking that it should not have even been submitted to the jury." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (internal quotation marks and citation omitted). A

claim of insufficient evidence fails if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (emphasis in original; internal quotation marks omitted).

**B.     The evidence sufficiently established that Merino conspired to defraud Medicare and committed health care fraud**

To establish a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, the government must prove that "there was an agreement between two or more persons to commit the crime of health care fraud" and that "the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it." ER 1466 (jury instructions). "[I]t is well-established that a jury may infer the existence of an agreement from circumstantial evidence, such as the defendant's conduct." *United States v. Garrison*, 888 F.3d 1057, 1064 (9th Cir. 2018) (internal quotation marks omitted).

To sustain a conviction for health care fraud, the government must prove that the defendant "knowingly and willfully" executed or attempted to execute a scheme "to defraud any health care benefit program" or "to obtain, by means of false or fraudulent[ or] representations . . . any of the money or property owned by, or under the custody or control of, any health care benefit

program." 18 U.S.C. § 1347(a). To establish "willful intent," the government must prove that the defendant acted "with knowledge that his conduct was unlawful." *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007) (internal quotation marks omitted). Because direct proof of such intent is "rarely available," "willfulness may be inferred from circumstantial evidence of fraudulent intent." *Id.* (internal quotation marks omitted).

Apart from committing the actual fraud herself, a defendant who is not herself a health care provider can be found guilty of substantive health care fraud in one of two ways. First, under *Pinkerton v. United States*, 328 U.S. 640 (1946), a defendant charged with participating in a conspiracy may be subject to liability for offenses committed as part of that conspiracy, even if the defendant did not directly participate in each offense. *Id.* at 647; *United States v. Hernandez-Orellana*, 539 F.3d 994, 1007 (9th Cir. 2008) (*Pinkerton* "renders all co-conspirators criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not."). Second, under 18 U.S.C. § 2, a defendant can be found guilty of aiding and abetting health care fraud if she associated with a criminal venture, participated in the criminal activity, and sought by her actions to make it succeed. *United States v. Boykin*, 785 F.3d 1352, 1359 (9th Cir. 2015).

### 1. The conspiracy count

Viewing the evidence in the light most favorable to the government and resolving all factual conflicts and credibility disputes in the government's favor, a rational juror could have concluded that Merino was a member of the conspiracy to defraud Medicare and possessed the requisite knowledge and intent.

To begin, Merino was well aware that the scheme involved Medicare claims. The patients had to show the marketers their Medicare cards – and have their Medicare eligibility verified by Glazer's receptionist – before the marketers even brought the patients to the clinic. ER 408-09. Merino also had an inside source at the Social Security Administration who provided her with names of Medicare beneficiaries. ER 460, 516. And Merino also knew that the Glazer Clinic, Fifth Avenue, and other Medicare providers submitted claims for the patients she recruited because her kickbacks depended on Medicare accepting the claims. ER 455-56, 461, 473.

A reasonable juror also could infer that Merino knew that the scheme involved the submission of claims for unnecessary services. Contrary to Merino's claims, she knew the specific service or DME that the providers submitted on the Medicare claims because Avetisyan told the marketers what their payment was for. ER 461. The marketers' receipts similarly included the

specific provider that submitted the claims. ER 462, 465. Furthermore, the jury could reasonably find that Merino knew that the claimed services were unrelated to the patients' medical needs. The marketers' job was to find Medicare beneficiaries and bring them to the clinic regardless of their condition in order to "receive several benefits that Medicare was giving, such as wheelchairs and nurse services, like home health care." ER 387. Merino also could observe for herself that her patients were mobile and able to fend for themselves but were prescribed home nursing services nonetheless. *See*, *e.g.*, ER 670, 672, 675-76, 846-47, 849-51, 1024-25. Merino similarly knew that the prescriptions and orders were determined by the likelihood that Medicare would pay. For example, as O'Brien explained, once Medicare changed its reimbursement policy on power wheelchairs and paid only for rentals rather than purchases, "[t]hat was when we started with home health." ER 437; *see also* ER 451 (signing up patients for hospice care "was another way of making money" "when the wheelchair thing had changed"). Indeed, before even bringing the patients to the clinic, Merino had to verify with Nara that they were "eligible," which meant that the Medicare claims likely would be accepted because the patients had not previously received power wheelchairs or were not currently getting nursing services. ER 409.

Other evidence supported the inference that Merino knew that her conduct was unlawful and that she was participating in a conspiracy to commit health care fraud. She does not dispute that she received kickbacks, which, by itself, "is clearly a possible indicator of health care fraud." *United States v. Martinez*, 921 F.3d 452, 471 (5th Cir.), *cert. denied*, 140 S. Ct. 571 (2019). In addition, she received checks with false notations in the memo lines, and she discussed a cover-up scheme with Avetisyan and O'Brien after fraud investigators visited the Glazer Clinic and Fifth Avenue. ER 525-26, 540-42. True to that plan, Merino initially told Agent Li that her work for the Glazer Clinic consisted only of handing out flyers and occasionally cleaning the offices. ER 969. The jury could rely on her participation in the cover-up, her evolving accounts of her work at the clinic, and her outright lies to infer that she had the requisite knowledge and intent. *See Dearing*, 504 F.3d at 902 ("The jury could also have inferred willful intent from [defendant's] misrepresentations and efforts to conceal the [fraudulent billing] activity."); *Garrison*, 888 F.3d at 1064 ("Inconsistencies or lying can lead a jury to infer intent."); *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (per curiam) ("It is settled law that intent to defraud may be established by circumstantial evidence," including "from misrepresentations made by the defendant[].") (internal quotation marks omitted).

Finally, a rational juror could infer that Merino had the same knowledge about the way the scheme worked that O'Brien had. Like O'Brien, Merino stayed with her patients during their visit to the clinic and would have seen the same evidence of wrongdoing that O'Brien saw. Moreover, because Merino had "started out with [Avetisyan] from the time [Avetisyan] opened," she was paid even more than O'Brien when her recruitment efforts were successful. ER 460. There was no logical reason why Avetisyan would have shared details of the fraudulent scheme with O'Brien while keeping Merino in the dark.

Even if Merino did not have actual knowledge of the health care fraud, the jury could conclude that she had the requisite knowledge because she deliberately ignored the fraud that was taking place around her. *See United States v. Heredia*, 483 F.3d 913, 918 (9th Cir. 2007) (en banc) ("'[K]nowingly' in criminal statutes is not limited to positive knowledge, but includes the state of mind of one who does not possess positive knowledge only because he consciously avoided it.") (internal quotation marks omitted). First, the circumstances were indeed suspicious. As the government argued in summation, "there is something very wrong" with approaching people on the street who have no apparent medical problem, asking for their Medicare cards, and offering them gifts to go to an unfamiliar clinic. ER 1592. Merino also knew that Medicare was paying for home health care for some of her patients

even though they were ambulatory and functioning outside their homes, *see* page 29 *supra*, and that patients were told to sign blank forms documenting services that had not yet been provided, ER 448, 451, 466.

Furthermore, the payments that Merino received for her marketing activities were unusual. She was not paid per patient or per hour (as she falsely claimed to Agent Li); instead, her payments were determined by the type of claim that the Medicare provider submitted, and she was paid only if Medicare in fact paid the provider. ER 455-56, 461, 473, 973. Merino also knew that investigators had been to the Glazer Clinic, that the marketers had been instructed to stay away from the clinic until the investigation was over, and that Avetisyan had devised a cover-up if the marketers were questioned. ER 540-43. That evidence permitted a reasonable jury to infer that Merino had subjective knowledge of a high probability that Glazer, Avetisyan, and Minasyan were submitting fraudulent claims to Medicare for the patients that she recruited, and her failure to ask any questions of Avetisyan and Minasyan – especially after the 2012 on-site investigation – demonstrated that she purposely avoided learning the truth about the unlawful activity. *See United States v. Walter-Eze*, 869 F.3d 891, 910 (9th Cir. 2017) ("a reasonable jury could find that Walter-Eze knew there was a high probability that the [patient] referrals were being obtained fraudulently but failed to investigate the matter to

ascertain the truth"); *United States v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013) (a defendant's failure to investigate "can be a deliberate action").

### 2. The substantive health care fraud counts

The evidence also was sufficient to support Merino's convictions on the substantive counts. The jury could reasonably find that Merino was the marketer responsible for each of the patients named in those counts based on the documents seized from Fifth Avenue that identified "Mary" (or some variant of that spelling) as the patient recruiter associated with each of them. ER 935-37, 943-44; SER 13-15, 19-20. In addition, although they did not identify Merino in court, Octavio Leiva testified that someone named "Mari" took him and his wife to Glazer's office, ER 846-47, and Rosalia Cedeno identified the person who first approached her as "Maria," ER 897. And O'Brien confirmed that Merino was known as "Mare." ER 514-15.[4]

Without acknowledging *Pinkerton*, Merino argues (Br. 19) that the government "had to proceed under an aiding and abetting theory of liability." Because she does not contest that the evidence sufficiently proves, for each substantive count, that Medicare fraud was committed, she is guilty of each of

---

[4] O'Brien explained that Minasyan's pronunciation of the name "Mare" differed from the Spanish pronunciation, ER 514-15, which likely accounted for the various spellings in the documents.

those counts so long as Glazer's and Avetisyan's acts of health care fraud were reasonably foreseeable to her.

A reasonable juror could find that they were. Merino brought the patients named in the substantive counts to the Glazer Clinic for the specific purpose of generating the orders and referrals that Glazer and Fifth Avenue subsequently submitted to Medicare. And, as discussed above, there was ample evidence for the jury to conclude that she possessed the requisite knowledge of the conspiracy's unlawful purpose.

The evidence similarly established that Merino was guilty under an aiding and abetting theory. Merino identified the Medicare beneficiaries and transported them to Glazer's clinic so that Glazer could generate the fraudulent prescriptions. In that way, the evidence showed that Merino "associated with the criminal venture, participated in it, and sought, by [her] actions, to make it a success." *See Boykin*, 785 F.3d at 1359.

### 3. Merino's specific arguments to the contrary lack merit

Merino contends that her convictions should be reversed because she did not know Medicare's evaluation requirements and did not submit the claim forms or know what was in them. As an initial matter, "defendants need not have personally submitted the necessary forms requesting reimbursement from Medicare to be guilty of health care fraud or conspiracy to commit health care

34

fraud." *United States v. Barson*, 845 F.3d 159, 164 (5th Cir. 2016) (per curiam); *see United States v. Pham*, 352 F. App'x 189, 190 (9th Cir. 2009) (unpublished) (rejecting defendant's argument that evidence was insufficient because, among other things, she did not bill Medicare or forge documents; "The government . . . was not required to prove that Pham was a principal actor in the scheme, only that she had the requisite knowledge and intent to defraud a health benefit program."). Merino's guilt also is not negated because she was unaware of the technical aspects of the Medicare regulations. As discussed in more detail below, the government need not prove that the defendant knew that her unlawful conduct violated a specific statute or regulation; it is enough to prove that she knew her conduct was wrongful. *See* pages 47-49 *infra*.

By the same token, it is irrelevant whether Merino knew the specifics of the fraudulent claims that Glazer and the other providers submitted to Medicare. To be guilty of conspiracy, Merino need know only "the essential nature of the plan and [her] connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947); *see also United States v. Corona-Verbera*, 509 F.3d 1105, 1117 (9th Cir. 2007) ("A defendant may be 'slightly connected' [with a conspiracy] even if he did not know all the conspirators, did not know all the details of the conspiracy, did not participate in the conspiracy from the

outset, and did not participate in all the enterprises of the conspiracy."). Likewise, "[a] defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense." *Rosemond v. United States*, 572 U.S. 65, 73 (2014) (internal quotation marks omitted).

Merino's claim that she had no knowledge of the fraudulent billing is also unsupported. As discussed, the evidence established that she knew both (1) about the claims the providers submitted to Medicare since her pay depended on them, and (2) that those claims were submitted for the purpose of procuring Medicare reimbursements rather than for a legitimate medical need. *See* pages 28-31 *supra*.

Merino also suggests that the evidence on the substantive counts is insufficient because the government did not establish that the names "Maria" and "Mari" in the beneficiaries' testimony and marketer logs necessarily referred to her. That alleged deficiency would not necessarily affect her liability under a *Pinkerton* theory, which turns on fraudulent submissions that her co-conspirators (not her personally) made in furtherance of the scheme. In any event, it too is unsupported. O'Brien explained that Merino was known as "Mari," and the various spellings of her name all referred to Merino. ER 400, 402, 514-15, 529, 531, 690.

Finally, relying on *Rosemond*, *supra*, Merino argues (Merino Br. 30-31) that the co-conspirators' cover-up plan and Merino's statements to Agent Li to the same effect are irrelevant because they pertain only to her knowledge at a point in time after the crimes were committed. The facts do not support her claim. Even assuming that Avetisyan first instructed the marketers on the cover-up in connection with the fraud investigators' on-site visit in September 2012, the substantive counts charged Merino with crimes that took place in 2013 and 2014. Furthermore, although Merino's statements to Agent Li post-dated her criminal conduct, it does not follow that she did not know of the charged illegality before then. *Cf. United States v. Hinostroza*, 297 F.3d 924, 928 (9th Cir. 2002) (reaffirming its precedent that "subsequent Rule 404(b) evidence" is probative of knowledge and intent at the time of the crimes).[5]

## II. There Was No Constructive Amendment of the Indictment.

(Merino Claim II, joined by Glazer)

---

[5] Merino relies on *United States v. Davis*, 863 F.3d 894 (D.C. Cir. 2017), but that factually distinguishable tax case provides no support for Merino's claim that she did not know that Glazer and the others were conspiring to defraud Medicare. The case is especially inapposite because aiding and abetting the preparation and filing of a false income tax return, in violation of 26 U.S.C. § 7206, requires proof of a heightened mens rea. *Cheek v. United States*, 498 U.S. 192, 200-01 (1991).

Merino contends (Br. 32-41) that the government constructively amended the indictment by "focus[ing] exclusively on her role as a marketer." Br. 34.[6] That claim lacks merit.

## A.   Background

In the section on "the manner and means of the conspiracy," the superseding indictment described the marketers' role in the health care fraud, including by recruiting Medicare beneficiaries and taking them to the Glazer Clinic so that Glazer could write medically unnecessary prescriptions and medically unnecessary certifications for home health and hospice care for the beneficiaries. ER 55-56. The superseding indictment also alleged that Merino and the other marketers were paid "cash and check kickbacks for bringing the Medicare beneficiaries to the Glazer Clinic." ER 56. Those allegations were incorporated in the section describing the "Means To Accomplish the Scheme to Defraud." ER 59.

---

[6] In the heading to her argument, Merino asserts, in the alternative, that there was a fatal variance between the charges in the indictment and the proof at trial. She does not develop this argument, and it is therefore waived. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003). In any event, as we explain below, Merino cannot show a material variance because the government did not present during trial "a materially different set of facts from those alleged in the indictment." *See United States v. Bhagat*, 436 F.3d 1140, 1146 (9th Cir. 2006).

The evidence at trial conformed to the allegations in the indictment, as did the district court's jury charge. *See* pages 6-12 *supra*; ER 1466-73, 1595-97. The jury instructions did not mention illegal kickbacks.

## B. Standard of review

This Court reviews *de novo* Merino's preserved claim of constructive amendment of an indictment. *United States v. Holden*, 806 F.3d 1227, 1231 (9th Cir. 2015).

## C. Argument

A defendant has a Fifth Amendment right to be tried only on charges contained in an indictment returned by a grand jury. *United States v. Antonakeas*, 255 F.3d 714, 721 (9th Cir. 2001). "A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Soto-Barraza*, 947 F.3d 1111, 1118 (9th Cir. 2020) (internal quotation marks omitted). The Court looks to the jury instructions for an assurance that the defendant's convictions are based on conduct charged in the indictment. *United States v. Ward*, 747 F.3d 1184, 1191 (9th Cir. 2014). This Court has held that a constructive amendment results in reversal without inquiry into prejudice. *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir. 2006).

Merino contends (Br. 33) that, in light of the government's proof at trial and arguments to the jury, which focused on her role as a paid marketer, "it is highly likely that the jury convicted Ms. Merino for engaging in receiving payments for marketing" rather than the "discretely pled [health care fraud] charges in the indictment." That argument fails for the simple reason that the jury was never instructed that it could convict Merino for accepting illegal kickbacks.[7] And the absence of such an instruction is fatal to her claim because an indictment is constructively amended only where "the evidence presented at trial, *together* with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment." *United States v. Arreola*, 467 F.3d 1153, 1162 (9th Cir. 2006) (emphasis added; internal quotation marks omitted).

Merino's arguments to the contrary lack merit. To be sure, the offense of health care fraud requires proof of deceit, while the offense of receiving illegal remunerations, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), does not. *See* Br.

---

[7] Merino contends (Br. 32) that the district court's jury instructions "guaranteed a constructive amendment or fatal variance," but the only instructions she cites are the court's "willful[] ignorance" and *Pinkerton* instructions. She does not explain further why those amounted to a constructive amendment. The court's comments in denying Merino's Rule 29 motion, outside the presence of the jury, *see* Br. 37, are not relevant to the constructive-amendment analysis.

32, 38 (citing *United States v. Ogba*, 526 F.3d 214 (5th Cir. 2008)).[8] But that difference does not mean that a marketer's receipt of illegal kickbacks is irrelevant to proving health care fraud. *See Martinez*, 921 F.3d at 471 ("Evidence of the kickback scheme is relevant to the conspiracy to commit health care fraud because paying patients is clearly a possible indicator of health care fraud."). For that reason, the fact that government witnesses testified about the illegality of accepting kickbacks does not support Merino's constructive amendment claim.

Merino is also wrong that the evidence about the kickbacks she and her family received has no bearing on the health care fraud charges. To the contrary, the timing and amount of the payments to Merino were directly related to the submission of the fraudulent claims because, as O'Brien testified, the marketers' earnings depended on the nature of the specific claim submitted to Medicare, and the marketers did not receive their cut until Medicare paid the claims. ER 455-56, 461, 473. The marketer logs also were relevant because they identified Merino as the recruiter associated with each of the patients

---

[8] *Ogba* also does not help Merino. In that case, the court concluded that the defendant's sentences for violating the illegal remunerations statute and committing health care fraud were multiplicitous because, as charged there, the defendant was guilty of health care fraud based solely on his receipt of illegal kickbacks. 526 F.3d at 236-37.

named in the substantive counts against her. And, although the government described Merino's role as a paid patient recruiter during its summations, it did not argue that Merino should be convicted because she received illegal kickbacks but instead explained how her conduct fit into the overall scheme to commit health care fraud. *E.g.*, ER 1492, 1497, 1590-94.

Merino's arguments, at bottom, are repeats of her challenges to the sufficiency of the evidence of her knowledge of the health care fraud scheme, *See* Br. 35-37, and should be rejected for the reasons stated above.

Glazer's claim is even more afield. Citing several transcript pages, he states in his joinder notice that the government "relied on the evidence of kickbacks in its argument about Dr. Glazer so the jury *could* have found Dr. Glazer guilty based on a kickback theory." Joinder in Codefendant's Opening Brief at 2 (emphasis in original). The only citation that is even close to suggesting that Glazer paid kickbacks was the government's reference to Glazer's transfer of money to the Hollywood PS bank account and Avetisyan's statement to O'Brien that the Hollywood PS checks were from Glazer. ER 1503-04. There is virtually no possibility that the jury convicted Glazer based solely on that brief argument rather than on the overwhelming evidence of his participation in the scheme to defraud Medicare. Nor would the jury

instructions on the elements of health care fraud logically permit conviction on that basis alone. ER 1469-72.

## III. The District Court Did Not Commit Reversible Error In Instructing The Jury.

(Merino Claim III, joined by Glazer)

Merino contends (Br. 41-48) that the district court abused its discretion by instructing the jury on a deliberate ignorance theory of knowledge and that its instructions on willfulness, *Pinkerton* liability, and intent to defraud were erroneous. This Court should reject those claims.

### A. Standard of review

This Court reviews the district court's decision to give a deliberate-ignorance instruction for abuse of discretion. *Walter-Eze*, 869 F.3d at 908. The Court will "second guess [the district court's] decision [to give the instruction] only in . . . rare cases," *Heredia*, 483 F.3d at 924, and will not "micromanage the district court[]" regarding when the instruction should be given, *id.* at 922. This Court reviews the district court's formulation of the *Pinkerton* instruction for abuse of discretion. *United States v. Long*, 301 F.3d 1095, 1104 (9th Cir. 2002) (per curiam). It reviews *de novo* whether the jury instructions on the meaning of "willfully" and "intent to defraud" accurately defined the elements

of the statutory offense. *United States v. Awad*, 551 F.3d 930, 938 (9th Cir. 2009).[9]

**B.  The district court did not abuse its discretion in instructing the jury on deliberate ignorance**

In *United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976) (en banc), this Court held that deliberate ignorance is the equivalent of positive knowledge, and that a statute requiring that the defendant act knowingly or with knowledge is satisfied by proof that he acted "with an awareness of the high probability of the existence of the fact in question." *Id.* at 700; *see Walter-Eze*, 869 F.3d at 909 ("*Jewell*'s 'core holding' was that, for the purposes of a criminal statute, an individual without 'positive knowledge' can be found to have acted 'knowingly' if the individual 'consciously avoided' obtaining actual knowledge.") (quoting *Heredia*, 483 F.3d at 918). "In deciding whether to give a willful blindness instruction, in addition to an actual knowledge instruction, the district court must determine whether the jury could rationally find willful blindness even though it has rejected the government's evidence of actual knowledge." *Heredia*, 483 F.3d at 922.

---

[9] Merino preserved the instructional claims that she raises here. ER 1297-1300, 1441-43.

The district court did not abuse its discretion in giving a deliberate ignorance instruction here. A reasonable jury could have concluded that, even if Merino did not have actual knowledge of the scheme to defraud Medicare, she deliberately failed to investigate while being aware of the high probability of the existence of the fraudulent scheme. *See* pages 31-33 *supra*. Furthermore, even if the district court abused its discretion by instructing the jury on deliberate ignorance, any error was harmless because, as discussed above, the government presented substantial evidence of actual knowledge. *See United States v. Alvarado*, 838 F.2d 311, 317 (9th Cir. 1987) (improper *Jewell* instruction was harmless error where actual knowledge was "abundantly clear" from the evidence).

Glazer adopts Merino's argument, but he has failed to show that her fact-specific claims apply to him. *See* 16AA Wright & Miller, *Federal Practice and Procedure* § 3974.5 (4th ed.) ("[A]doption by reference works only if the argument that is adopted applies to the adopting party."); *see also*, *e.g.*, *United States v. Brown*, 669 F.3d 10, 16 n.5 (1st Cir. 2012) ("Adoption by reference cannot occur in a vacuum and the arguments must actually be transferable from the proponent's to the adopter's case."). And because he has not argued how the instruction was erroneous as to him, this Court should not consider his challenge.

In any event, the instruction was warranted as to Glazer as well. Even if the jury did not believe that the evidence showed Glazer's actual knowledge of the scheme to defraud Medicare – and the evidence in fact demonstrated that he had such knowledge – there was also an adequate basis for the jury to conclude that Glazer was aware of a high probability that the claims that were submitted to Medicare were based on medically unnecessary tests and services or were not provided at all. For example, Glazer knew that patients for whom he prescribed home health care were ambulatory. He saw that the same individuals (the marketers) regularly came to the clinic, accompanied different patients, and stayed with them throughout their visits, and that Avetisyan sometimes paid them in cash. He also was on notice that Medicare had found his billings questionable, *e.g.*, ER 754-56, 758-59, 762, 781, but he continued the same practices nonetheless. Thus, even if he did not have actual knowledge of the fraud going on at his own clinic, it was only because he was willfully blind to the suspicious circumstances surrounding the clinic's operation. Finally, any error in giving the instruction was harmless because overwhelming evidence established Glazer's actual knowledge.

### C. The district court correctly instructed the jury on the meaning of the statutory term "willfully"

Merino next contends that, in defining the term "willfully," the district failed to instruct the jury that it had to find beyond a reasonable doubt that

"Ms. Merino knew her conduct was unlawful." Br. 46. Contrary to her claim, the court instructed the jury on precisely that: "The word 'willfully' means that defendant committed the act with a bad purpose; that is, with general knowledge that the defendant's conduct was unlawful." ER 1596; *see Awad*, 551 F.3d at 940 (in health care fraud case, a "willful" act is one undertaken with "bad purpose" and knowledge that conduct was unlawful) (internal quotation marks omitted); *Pham*, 352 F. App'x at 190 ("To prove that Pham acted willfully, 'the Government must prove that the defendant acted with knowledge that [her] conduct was unlawful.'") (quoting *Bryan v. United States*, 524 U.S. 184, 192 (1998)); *see generally Bryan*, 524 U.S. at 191 (observing that "willfully" is a "word of many meanings" and "[a]s a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose'") (internal quotation marks omitted).

To the extent that Merino is arguing, as she did in support of her proposed jury instructions, that the government had to prove she knew that the conduct of the Medicare providers "violated the specific Medicare regulations defining what services were 'medically necessary'" in order to convict her as an aider or abettor, *see* ER 1625, she is incorrect. As the Supreme Court explained in *Bryan*, the requirement that a defendant must be aware of the specific provision that he is charged with violating is a narrow exception "to the

47

traditional rule that ignorance of the law is no excuse," and that "carve out" has been applied only when there is a "danger of convicting individuals engaged in apparently innocent activity," 524 U.S. at 195-96 (internal quotation marks omitted); *see id.* at 194 (noting that Court has applied the more stringent interpretation of "willfully" in the context of some tax statutes and statute prohibiting the illegal structuring of cash transactions to avoid a reporting requirement). Because that danger is not present in this fraud case, "knowledge that the conduct is unlawful is all that is required." *Id.* at 196. *See United States v. Shvets*, 631 F. App'x 91, 95 (3d Cir. 2015) (unpublished) (rejecting defendant's argument that "§ 1347 requires proof of the defendant's knowledge of the statute"); *see also* 18 U.S.C. § 1347(b) ("With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.").

Merino's reliance on *United States v. Henderson*, 243 F.3d 1168 (9th Cir. 2001), is unsupported. In that case, which involved the meaning of "willfully" in a regulation governing the occupancy of public lands, this Court relied on *Bryan* and held that the lower court erred by refusing to instruct the jury that "'willfully' means that [the defendant] knew his conduct was unlawful." *Id.* at 1173. The district court did not make that error here. Furthermore, *Henderson* did not even reach the issue that Merino presses because it specifically declined

to decide whether the government had to prove that the defendant "had knowledge of the content of the specific regulations at issue." *Id.* (emphasis omitted).

**D.     The court properly instructed the jury on *Pinkerton* liability**

Adopting this Court's model jury instructions on co-conspirator liability, *see* Ninth Circuit Manual of Modern Criminal Jury Instruction § 8.25, the district court charged the jury that, in addition to the other requirements, the jury had to find that "the [substantive] offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement." ER 1595-96. Merino argues (Br. 46-47) that the instruction was inconsistent with the Supreme Court's decision in *Rosemond v. United States*, 572 U.S. 65 (2014), because it did not "articulate the specific time at which Ms. Merino must have had knowledge of the unlawful agreement as an aider and abettor." That argument fails because her underlying premises are wrong.

First, *Rosemond* has nothing to do with *Pinkerton* liability. In *Rosemond*, the Supreme Court held that an accomplice must have "advance knowledge" of the crime the principal is planning to commit, meaning "knowledge at a time the accomplice can do something with it – most notably, opt to walk away." 572 U.S. at 78. A conviction under a *Pinkerton* theory, on the other

hand, independently "renders all co-conspirators criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy." *Hernandez-Orellana*, 539 F.3d at 1007. The two are alternative theories. *See United States v. Bingham*, 653 F.3d 983, 997 (9th Cir. 2011) ("aiding-and-abetting liability differs from *Pinkerton* liability"); *United States v. Nakai*, 413 F.3d 1019, 1023 (9th Cir. 2005) (*Pinkerton* liability "broadens a defendant's liability beyond the aiding and abetting charge"). Accordingly, "*Rosemond* did not alter the *Pinkerton* framework." *United States v. Edmond*, 815 F.3d 1032, 1047 (6th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1577 (2017); *see also United States v. Adams*, 789 F.3d 713, 713-14 (7th Cir. 2015) (rejecting defendant's argument that *Rosemond* imposed "new, and more stringent, rules for co-conspirator liability").

Nor was Merino convicted of "aiding and abetting" the conspiracy charged in Count One, as she appears to assume. *See* Merino Br. 46. Instead, assuming the jury convicted her under an aiding and abetting theory, that theory applied only to the substantive health care fraud counts, as the court's instructions made clear. ER 1469-73. And, the district court incorporated the *Rosemond* requirement in those instructions. ER 1472-73 (court instructs the jury that, to find a defendant guilty of health care fraud by aiding and abetting, it must find that "the defendant acted before the crime was completed" and

that "the defendant acted with the knowledge and intention of helping that person commit health care fraud").

### E. Any error in the court's instruction on intent to defraud was harmless

Merino argues (Br. 47-48) that, in charging the jury on the intent-to-defraud element of health care fraud, the district court erred by stating that the government had to prove that "the defendant acted with intent to defraud; that is, the intent to deceive *or* cheat." ER 1470 (emphasis added). Merino is correct that, in an opinion following the Supreme Court's decision in *Shaw v. United States*, 137 S. Ct. 462 (2016), this Court has held that the similarly worded wire fraud statute requires that "a defendant must intend to deceive *and* cheat." *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) (finding instructional error but concluding that it was harmless). Under the decision in *Miller*, the government must prove an intent "not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions." *Id.*

This Court has not yet decided whether *Miller* extends to the health care fraud statute. And it need not do so in this case because, as in *Miller*, any instructional error here was harmless beyond a reasonable doubt. *See United States v. Mikhel*, 889 F.3d 1003, 1058 (9th Cir. 2018) ("Error in a jury

instruction . . . is harmless if it is clear beyond a reasonable doubt that a rational jury would have reached the same decision absent the error.") (internal quotation marks omitted); *see also United States v. Mirando*, 768 F. App'x 596, 599 (9th Cir. 2019) (unpublished) (concluding that any instructional error in health care fraud case was not reversible under plain error review); *United States v. Shaw*, 885 F.3d 1217, 1218-19 (9th Cir.) (same as to bank fraud instructions), *cert. denied*, 139 S. Ct. 350 (2018). Merino and Glazer's only defense was that they did not know that Medicare claims submitted by the Glazer Clinic, Fifth Avenue, and the other Medicare providers were fraudulent, *see* Merino Br. 8; ER 1546-47, and any distinction between "deceive" and "cheat" was immaterial to that defense. Furthermore, under the facts of this case, a rational jury could not have found that defendants intended to deceive Medicare but not to cheat it out of money.

## IV.  There Was No Prosecutorial Misconduct Warranting Reversal.
  (Glazer Claim A)

Glazer contends (Glazer Br. 16-19) that the prosecutors engaged in misconduct by questioning Glazer and a defense witness about the veracity of other witnesses. Glazer has not shown reversible misconduct.

### A. Background

1. During cross-examination, Glazer's business manager, Alex Kwechansky, testified that Avetisyan was "never [Glazer's] employee" and that "[s]he ran the office independently." ER 1099. The prosecutor then asked whether "Dr. Glazer [would] be lying if he said that she was his employee?" ER 1099. The prosecutor followed up with several questions about whether it would have been a lie if Glazer had reported to the Medicare contractor, SGS, that Avetisyan and Narine Terteryan were his employees, and Kwechansky stated that it would be a "misunderstanding, potentially a lie" because Glazer had "no employees." ER 1100-01.

2. SGS fraud investigators Jo Thompson and Stephen McNulty testified about a form (the "declaration" or "attestation" form), which they had left with Glazer at their first on-site visit in September 2012. ER 768, 811; SER 1-3. The form listed 53 patients that had been referred to Fifth Avenue for home health care, and the investigators asked Glazer to review the list and verify whether he had referred each patient to Fifth Avenue. ER 768-69, 811-12; SER 1-3. The investigators collected the form at their second visit a few days later. ER 768-70, 811-12. Glazer certified that "all 53 [patients] were referred over to Fifth Avenue Home Health," and he signed the declaration. ER 812. He did not "indicate" to the investigators that "there were any issues with his

signatures" or that "somebody else might be signing documents for him." ER 771.

During cross-examination, the prosecutor asked Glazer whether he recalled the investigators' testimony about the form. ER 1368. Glazer did not remember whether he had "handed this form" to the investigators and questioned whether the signature was his. ER 1369. The prosecutor then asked whether it was his testimony that "this document, which was signed . . . in front of auditors from Medicare who came to your office, you can't be sure that this is your signature," and Glazer stated that he did not recall signing the document in front of the investigators. ER 1369. The following exchange then took place:

> Q: So you can't – you're saying that didn't happen?
>
> A: I'm saying I can't remember that it happened, and that I've said many times, I found a rubber stamp of my signature, which I had never authorized.
>
> Q: Okay. And you're saying who did say that this did happen would be lying? Is that your testimony?
>
> A: No. I'm not – maybe they don't remember exactly what they said or they know that they're going to court so they phrased things in a certain way.

ER 1370-71.

3. The prosecutor also asked Glazer about the information in the patient charts and whether it was false. In several instances, the prosecutor asked

Glazer whether specific patients had lied when they testified that they did not have the symptoms that Glazer documented in the patient records. ER 1413 ("You're saying Mr. Aleman came in here and lied [about not having sleep problems]; is that what you're saying?"); ER 1418 ("So is it your testimony that these patient charts are lies or are you saying Ms. Ortega was lying?"); ER 1418 ("Isn't it your testimony today that each and every one of the patients who came and testified in court today was lying?"). Glazer responded that Mr. Aleman and the other patients might have been mistaken, ER 1414, 1418; that Ms. Ortega "did not think to reveal important information" and "just wanted people to think that she felt well for whatever reason," ER 1418; and that the patients were "enthusiastic or wanting people to think that they felt great," ER 1418.

4. In its instructions to the jury, the district court cautioned that lawyers' questions "are not evidence" and that the jury should not consider them in deciding the facts. ER 1460-61. It also explained the various reasons why witnesses give different accounts of events and instructed that the jury should "not decide that testimony is untrue just because it differs from other testimony." ER 1462-63.

## B.    Standard of review

Glazer did not object to the prosecutor's questions at trial.[10] This Court

therefore reviews the claims for plain error. *United States v. Reyes*, 660 F.3d 454,

462 (9th Cir. 2011). To prevail under that standard, Glazer must establish "(1)

there was error; (2) it was plain; (3) it affected the defendant's substantial

rights; and (4) viewed in the context of the entire trial, the impropriety

seriously affected the fairness, integrity, or public reputation of judicial

proceedings." *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1191 (9th Cir.

2015) (internal quotation mark omitted).

## C.    The prosecutors did not plainly commit misconduct

1. "It is generally improper for an attorney to compel a witness to testify

that another witness lied." *United States v. Ramirez*, 537 F.3d 1075, 1084 (9th

---

[10] Contrary to Glazer's contention (Br. 15), he did not preserve his challenge to the question to his business manager because he objected on different grounds than asserted here. *See* ER 1100-01 ("argumentative and badgering"; "[c]alls for speculation, hypothetical."). "[A] party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, but also by making the wrong specific objection." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1152 (9th Cir. 2012) (internal quotation marks omitted). Even assuming that Glazer preserved this one claim, this Court reviews the "combined prejudicial effect" of the multiple alleged errors, only some of which were preserved, under the plain error standard. *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1191 (9th Cir. 2015).

Cir. 2008). That rule "ensures that determinations of credibility remain within the sole province of the jury." *Alcantara-Castillo*, 788 F.3d at 1191.

The government concedes that the prosecutor's questions asking Glazer to comment on the patients' veracity were improper. Although the prosecutor's question about the "declaration" form, with its imprecise references ("you're saying whoever did say that this did happen would be lying[]," ER 1370), is less clear, to the extent it similarly required Glazer to comment on the investigators' testimony, it also was improper.

The prosecutor's questions to Kwechansky, on the other hand, were not improper, or at least not plainly so. Read in context, the prosecutor was not asking the witness to opine on the veracity of Glazer's testimony – indeed, Glazer had not yet testified – but to contrast the witness's explanation about Avetisyan and Narine Terteryan's status with Glazer's prior statements to the Medicare contractor, SGS. *See United States v. Woolem*, 765 F. App'x 358, 359 (9th Cir. 2019) (unpublished) ("Our cases finding prosecutorial misconduct involve questions that asked a defendant to comment directly on the testimony of another witness."). In any event, this Court need not decide whether this particular question was improper because any difference between Kwechansky's and Glazer's views of whether those individuals were employees or independent contractors hardly mattered in judging the two

defense witnesses' credibility. *See United States v. Macias*, 789 F.3d 1011, 1022 (9th Cir. 2015) (declining to decide merits of preserved objection that admission of certain evidence amounted to improper attempt to have one witness testify as to another witness's credibility because any error was harmless).

2. Glazer has not demonstrated that he was prejudiced by the admission of his testimony regarding the veracity of the government's witnesses. Glazer's response to the prosecutor's single question as to whether Glazer thought the fraud investigators had lied about the timing of his signature on the declaration form was of minor importance to the case.[11] His testimony regarding the patients' veracity, even when viewed cumulatively, also did not affect Glazer's substantial rights because, as the district court noted, the evidence was "overwhelming." Dkt. 535, at 7-8; *see, e.g.*, *Ramirez*, 537 F.3d at 1086 (admission of testimony regarding other witnesses' veracity was not reversible plain error in light of overwhelming evidence of guilt); *United States v. Harrison*, 585 F.3d 1155, 1159 (9th Cir. 2009) (same); *see generally United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005) ("[w]hen the case is

---

[11] The investigators' testimony does not clearly specify whether Glazer signed the form in their presence or whether it was already signed when they collected it at their second on-site visit. ER 768-69, 812.

particularly strong, the likelihood that prosecutorial misconduct will affect the defendant's substantial rights is lessened because the jury's deliberations are less apt to be influenced").

O'Brien's testimony alone established the pervasive fraud at the Glazer Clinic. Glazer ordered costly DME, home health care, and hospice care following, at most, superficial examinations in his office of patients who obviously did not need those services. O'Brien's testimony that the patients were mobile was corroborated, in some cases, by the patients' treating physicians or their relatives who attested to the patients' overall health and ability to care for themselves. *E.g.*, ER 593-95, 654, 659-660, 858-59, 1024; *see also* Dkt. 535, at 7-8 (district court states that "what was striking in front of the jury" was "[p]eople who had been ordered these power wheelchairs who walked up to the witness stand and climbed the stairs to take their seat"). Glazer prescribed power wheelchairs without discussing with the patients whether they needed them, changed that practice only because many patients returned the wheelchairs, and stopped prescribing them when Medicare revised its reimbursement policy. ER 435-37.

Overwhelming evidence similarly established that entries in the patients' files were false. In addition to the patients' own testimony, relatives testified that the patients did not get tests that Glazer documented in the records. ER

650-52, 655, 860-61; *see also* ER 438 (O'Brien never saw Glazer give an allergy test or "perform any type of test on a patient" when she was at the clinic and "no patient at no time mentioned anything like this to me"). Incredibly, multiple copies of identical EKGs showed up in different patients' files, bearing Glazer's initials and indicating, according to his testimony, that he had reviewed them. ER 962-68, 1317, 1330.

Other documentary evidence confirmed the fraud. The corrupt relationship between Glazer and Avetisyan was reflected in Glazer's home health care referrals, which accounted for 78% of Fifth Avenue's Medicare claims and caused Medicare to pay more than $3.3 million to that agency. ER 871; SER 28. Bank records and other financial evidence demonstrated that Glazer transferred more than one-third of his Medicare reimbursements to Avetisyan's corporation, Hollywood PS, which was a conduit for the payment of the kickbacks to the marketers. ER 691-92; SER 25. Furthermore, Glazer's explanation for the movement of funds – that Avetisyan covered his expenses (rent and salaries) when he could not afford to pay them and that he reimbursed her by transferring money to the Hollywood PS account when he received more money from Medicare – was both inconsistent with how legitimate businesses with fixed expenses operate and incredible on its face. At bottom, the prosecutor's questions played a minimal part in undermining

Glazer's credibility; instead, the jury almost certainly rejected his testimony because his explanations made no sense.

In light of the overwhelming evidence, this case is distinguishable from those in which this Court has concluded that the improper questioning was reversible plain error. *See United States v. Geston*, 299 F.3d 1130, 1136-37 (9th Cir. 2002) (noting that defendant's first trial, which resulted in a hung jury, did not include the improper questioning and concluding that "[t]his circumstance leads [the Court] to conclude that the improper questioning impacted Geston's due process rights"); *United States v. Combs*, 379 F.3d 564, 572 (9th Cir. 2004) (disagreeing with government that evidence of defendant's guilt was "overwhelming"); *Alcantara-Castillo*, 788 F.3d at 1197 (noting "closeness of the case"). Nor is this a case that "boiled down" to whether the jury believed Glazer or the patients. *Combs*, 379 F.3d at 573; *see also Geston*, 299 F.3d at 1137 (finding reversible plain error when "witness credibility was paramount"); *Alcantara-Castillo*, 788 F.3d at 1196 (finding reversible error where "[t]here [was] no question that witness credibility was paramount" and "[t]his particular credibility contest was made even closer by the significant credibility problems of each of the contestants"). As discussed above, there were many reasons for the jury to find that Glazer's orders and referrals were fraudulent besides the patients' testimony. Nor did Glazer "impugn the veracity" of the

patients. *Alcantara-Castillo*, 788 F.3d at 1198. He denied that the patients had lied during their testimony and offered an explanation that arguably helped him. ER 1414 (Mr. Aleman "might have been mistaken"), ER 1418 (Ms. Ortega "wanted people to think that she felt well for whatever reason"); *cf. Ramirez*, 537 F.3d at 1085-86 (explaining that defense attorney's failure to object to questions may have been part of a legitimate defense strategy because it allowed the defendant to testify about why he thought the other witnesses were lying). Glazer's defense also did not hinge on whether the patients were untruthful. Glazer contended that he had no way of knowing whether the tests, services, and equipment he prescribed were actually provided, and he testified that he had a medical justification for the prescriptions and orders regardless of whether the patient or Medicare thought they were necessary. *E.g.*, ER 1553, 1564, 1566-69, 1573-77.

This case is also unlike *Combs* and *Alcantara-Castillo*, where the Court found that the improper questioning was compounded by other errors. *See Alcantara-Castillo*, 788 F.3d at 1198 (error in forcing defendant to impugn agent's "critical[] and possibly determinative testimony" was "compounded by improper vouching that was not fully remedied by the district court's minimal curative instruction") (internal quotation marks omitted); *Combs*, 379 F.3d at 573 (similar). The sole statement in the prosecutor's rebuttal that Glazer

challenges – that "after hearing what he calls 'those people' testify, he claimed that they were confused or mistaken or simply lying about their medical conditions because they didn't want you to know how sick they were," ER 1585-86 – is not akin to the government's improper arguments in those two cases. *See Alcantara-Castillo*, 788 F.3d at 1197 (prosecutor improperly vouched for agent's credibility when, in comparing "the credibility of a 15-year methamphetamine addict" to the testimony and evidence of Border Patrol agents "who are sworn to uphold the law," prosecutor referred to facts not in evidence to convince the jury to credit the agent's testimony) (internal quotation marks omitted); *Combs*, 379 F.3d at 567 (contrasting motive to lie by defendant who faced two felony charges with that of the agent who "will get up and go to work on Monday as he has done for the past ten years regardless of the outcome of this case") (internal quotation marks omitted); *id.* (arguing in rebuttal, among other things, that jury has to believe that agent "flushed his ten-year career down the toilet . . . [f]or a nice old grandfatherly man" and that "you can be darn sure he would get fired for perjuring himself") (internal quotation marks omitted). In light of the discrepancies between the information in the patient files and the testimony of the patients, it also was proper for the government to acknowledge these conflicts during summation. *See United States v. Wilkes*, 662 F.3d 524, 540 (9th Cir. 2011) (government's

argument that its witnesses told the truth, rather than the defendant, was not improper because it was simply an inference from evidence in the record); *United States v. Moreland*, 622 F.3d 1147, 1161 (9th Cir. 2010) (in instances of flatly contradictory testimony on important issues, it is proper for the government to argue that the jury ought not to believe the defendant's version).

For largely the same reasons, Glazer has not demonstrated that the improper questions "were serious enough to constitute a miscarriage of justice." *Ramirez*, 537 F.3d at 1086. As noted, Glazer did not testify that the patients lied, but instead offered an alternative, more benign explanation for the discrepancy between their testimony and the patient files. Nor was his testimony about the witnesses' veracity "unduly inflammatory []or prejudicial." *See id.* Moreover, the court instructed the jurors that lawyers' questions "are not evidence" and cautioned that discrepancies between witnesses' testimony does not mean that the "testimony is untrue." ER 1460-61, 1463; *see United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1030 (9th Cir. 2009) ("juries are assumed to follow the court's instructions"). When viewed in the context of the entire trial, the improper questioning was not serious enough to constitute a miscarriage of justice.

## V.    The District Court's Method of Designating Alternate Jurors Is Not Reversible Error.

(Glazer Claim B, joined by Merino)

Glazer contends (Br. 19-22), for the first time on appeal, that the district court committed structural error by permitting courtroom spectators to designate the alternate jurors. That claim lacks merit.

## A.  Background

At a pretrial conference, the district court stated that it "personally [did] not like identifying jurors as being alternates" at the start of the trial because it "want[ed] everyone to be alert" and "think that they are going to be on the jury." Glazer ER 552. Accordingly, it explained, "[w]e can decide at the end of the presentation of evidence as to who the alternates are, and we can do any number of things," including "just randomly pick[ing] two numbers, and those two numbers then will be the alternates, or we can do any way you wish."[12] Glazer ER 552. The court asked whether there was "any disagreement" with his proposal and "[saw] no hands." Glazer ER 552.

Consistent with that plan, the court selected 15 jurors without designating which ones were alternates, and it returned to the selection of the alternates before the jury began its deliberations. ER 1601-03. The government and Glazer agreed that the court "should do it any way that [the court] want[ed]," while Merino disagreed with Glazer and preferred that the court

---

[12] The court subsequently seated 15, rather than 14, jurors. *See* ER 469.

"do it by lot." ER 1602. The court then asked unidentified individuals to "pick a number between 1 and 15," three unidentified voices selected numbers eight, six, and four, and the court designated the jurors corresponding to those numbers as the alternates. ER 1602. The alternate jurors did not participate in the deliberations. ER 1604.

## B. Standard of review

This Court ordinarily reviews *de novo* whether a district court's jury selection procedure comports with the requirements of Fed. R. Crim. P. 24(c). *United States v. Trigg*, 988 F.2d 1008, 1011 (9th Cir. 1993). Because Glazer did not object to the district court's procedure, his claim is reviewed for plain error. *See United States v. Olano*, 507 U.S. 725, 741 (1993) (applying plain error review to unpreserved claim that alternate jurors attended deliberations in violation of Rule 24(c)). Although Merino disagreed with Glazer's concession that the district court had free rein in selecting the alternate jurors, she did not object to the procedure the court subsequently adopted. Nor did she object during jury selection, when the court's failure to comply with Rule 24(c) was apparent. Her claim is therefore reviewed for plain error as well.

## C. The court's error in designating the alternate jurors was harmless

Federal Rule of Criminal Procedure 24(c) requires that an alternate juror have the same qualifications and be selected and sworn in the same manner as

any other juror. *See* Fed. R. Crim. P. 24(c)(2)(A), (B). The courts of appeals

that have considered the issue have interpreted that provision as requiring that

"jurors be selected before the presentation of evidence, beginning with the

panel of 12 and then, separately, alternate jurors." *United States v. Seifer*, 800

F.3d 328, 330 (7th Cir. 2015) (per curiam) (collecting cases). The district court

failed to comply with that procedure when it designated the alternate jurors at

the start of jury deliberations. *See United States v. Aguon*, 851 F.2d 1158, 1171

(9th Cir. 1988) (en banc) (designation of alternate jurors at the start of jury

deliberations was an "unauthorized deviation from standard procedure")

(internal quotation marks omitted), *overruled on other grounds by Evans v. United

States*, 504 U.S. 255 (1992); *United States v. Vega*, 585 F. App'x 618, 619-20 (9th

Cir. 2014) (unpublished) (district court violated Rule 24(c) when it "randomly

designated the alternate jurors at the close of trial"). That Rule 24(c) error,

however, is not grounds for reversal because defendants have failed to

demonstrate that the error affected their substantial rights, as required under

the third prong of the plain error test. *See Aguon*, 851 F.2d at 1171 (stating that

"the defendant has presented no scenario in which this procedure could have

prejudiced her" and that "[t]he court's error was harmless" under Fed. R.

Crim. P. 52(a)) (internal quotation marks omitted); *United States v. Olano*, 62

F.3d 1180, 1190 n.3 (9th Cir. 1995) (stating that error in designating alternates

was harmless because there was "no way" in which defendant could show prejudice); *Vega*, 585 F. App'x at 619-20 (same). Because defendants do not even attempt to show prejudice, their claim fails as well.[13]

Glazer acknowledges the prejudice requirement but argues that this case is different because the court allowed audience members to select numbers, which the court then used to designate the alternate jurors. He argues that the procedure "undercuts fundamental principles which govern jury selection" because, under the Jury Selection Act and the Sixth Amendment, defendants have a right to "'juries selected *at random* from a fair cross-section of the community.'" Br. 21 (quoting *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1158 (9th Cir. 2014) (en banc)). But the alternate jurors *were* selected "at random from a fair cross-section of the community"; they were members of the same venire as the impaneled jurors, whose composition Glazer does not challenge. Nor does he contend that the alternate jurors were biased. *See Seifer*, 800 F.3d at 330 (defendant "does not assert that any of the 13 original jurors was biased, so he was still left with an impartial jury"). And, because the

---

[13] Glazer suggests (Br. 20-21) that the unidentified voices may have picked numbers based on their perceived views of the jurors' attitudes. Such "speculation," however, "cannot support a finding of actual prejudice." *United States v. Delgado*, 350 F.3d 520, 526 (6th Cir. 2003).

alternate jurors did not participate in deliberations, Glazer cannot show that they contributed to the jury's verdicts.

Glazer principally argues (Br. 21) that the court's procedure constituted structural error, and thus entitles him to relief without a showing of prejudice, because the court abdicated judicial control when it "allow[ed] . . . unknown individuals to use unknown standards" to select the alternates. But the cases Glazer cites are nothing like this one. In *Riley v. Deeds*, 56 F.3d 1117 (9th Cir. 1995), the judge's law clerk, rather than the judge, granted the jury's request to have the victim's testimony read back, and the jury "was then given effective control of what testimony and how much of it would be read." *Id*. at 1120. Under those circumstances, this Court held that this "complete abdication of judicial control" constituted structural error rather than mere trial error. *Id.* at 1121. In this case, on the other hand, the judge not only was present during the selection of the 15-person jury, but he also directed the process for the selection of the three alternates. That is hardly an "abdication of judicial control" as Glazer now claims.

Glazer's reliance on *United States v. Noushfar*, 78 F.3d 1442 (9th Cir. 1996), is similarly misplaced. There, the court allowed the jury "to listen, without any guidance, to tapes that had never been presented in open court." *Id.* at 1445. This Court held that the district court "completely abdicated

control of the presentation of the evidence" when "[i]t made no analysis of whether undue emphasis might be placed on some of the recorded conversations" and "gave no instruction that the jurors must listen to the tapes in their entirety in accordance with the rule of completeness and Fed. R. Evid. 106." *Id.* That error was "so fundamental and defie[d] meaningful review" because it "undermine[d] one of the most fundamental tenets of our justice system: that a defendant's conviction may be based only on the evidence presented during the trial." *Id.* The rule violation at issue here is not remotely comparable.

## VI. The District Court's Questions And Comments During Trial Did Not Constitute Judicial Misconduct, Much Less Plain Error.

(Glazer Claim C, joined by Merino)

Glazer contends (Br. 22-27) that the district court exhibited bias against the defense and that the court's comments and questions amounted to judicial misconduct and structural error. Those contentions lack merit.

### A. Standard of review

Claims of judicial misconduct in supervising trials are reviewed for abuse of discretion. *United States v. Morgan*, 376 F.3d 1002, 1006-07 (9th Cir. 2004). Because, with one exception, *see* n.14 *infra*, Glazer failed to object during trial or move for a mistrial, this Court reviews his claim for plain error only. *Id.* at 1007.

**B.** **Glazer has not demonstrated that the judge committed misconduct**

1. It is "well established" that a trial judge "is more than a moderator or umpire," *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir. 1986) (Kennedy, J.) (citing cases), and that he "has broad discretion in supervising trials," *United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994). It is "entirely proper for him to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony." *Mostella*, 802 F.2d at 361. Accordingly, "[b]efore a jury's verdict will be overturned because of the conduct of a trial judge in . . . intervening in the proceedings, it must appear that the conduct measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party." *United States v. Scott*, 642 F.3d 791, 799 (9th Cir. 2011) (per curiam) (internal quotation marks omitted). The record must "disclose[] actual bias on the part of the trial judge or leave[] the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality." *Mostella*, 802 F.2d at 361-62 (internal quotation marks omitted). "The assessment is to be made, moreover, in light of the evidence of guilt." *Scott*, 642 F.3d at 799 (internal quotation marks omitted).

71

2. Glazer does not allege that the judge was actually biased. Instead, he argues that the district court's questioning of Glazer "projected an appearance of advocacy and an appearance the court disbelieved" him, Br. 22 (capitalization altered), and he cites several instances in which that purportedly occurred, Br. 23-26. His contentions lack merit. In all those interventions, the court reasonably exercised its "undeniable authority to examine witnesses" to clarify issues and "call the jury's attention to important evidence." *Scott*, 642 F.3d at 799.

Glazer first argues that "just" the court's questioning of Kwechansky "came close" to "cross[ing] the line." Br. 23. But in the example he cites, the court attempted to clarify the unusual financial arrangements between Glazer and Avetisyan when it briefly questioned Kwechansky about Avetisyan's advance payments to Glazer and the employment status of the individuals who worked at the clinic. ER 1117-18. Nor was there anything improper when the court questioned Kwechansky, who held himself out as a "fraud expert," ER 1094, whether Kwechansky detected any fraudulent activity on the part of the Glazer Clinic as an organization (as opposed to Glazer individually). ER 1091-92.

Glazer's challenges to the court's questions and comments during his own testimony fare no better. For example, after Glazer testified that he did

not recognize the handwriting on the "diagnoses" section of a patient's chart and could not read some of what was written, the court asked Glazer "[w]ho else but you would be making diagnoses?" and how, "if [Glazer] [couldn't] read it, [he knew] what orders to make." ER 1196-98. The court's other attempts at clarification were similarly appropriate. For example, the court referred to Glazer's earlier testimony to clarify whether he conducted ultrasounds in his office. ER 1288.[14] The court also called attention to "important evidence," *see Scott*, 642 F.3d at 799, when, after Glazer testified that one cannot predict whether someone will die within six months, as required to qualify for hospice care, the court asked Glazer whether "[i]f you are off by four years, would that be cause for alarm that perhaps you were a bit premature in sending someone to hospice" and that "it [didn't] sound like death was imminent" in the case of Mr. Pogosyan. ER 1274. Finally, the court did not commit misconduct when it "correct[ed]" defense counsel's question asking Glazer whether he recalled Stepan Pogosyan's testimony that his father "was a normal – he had normal health." ER 1259-60. The court was literally correct that the witness had answered "[n]ormal" in response to a different question – whether Pogosyan was familiar with his "father's health state." ER

---

[14] This is the only instance in which Glazer objected to the court's "statement and question," and he did so after the jury was excused for the day. ER 1288.

1016-17. The court acknowledged in any event that its correction in that instance "may not be important," but it appropriately signaled that counsel should be careful in restating a witness's previous testimony. *See* ER 1260 (court states that "that came up once before").

Even if some of the court's comments or questions displayed sarcasm or suggested that it was skeptical of Glazer's testimony, Glazer has not shown that the conduct – "measured by the facts of the case presented together with the result of the trial" – was "clearly prejudicial" to his rights. *Scott*, 642 F.3d at 799 (internal quotation marks omitted). To begin with, when viewed against the lengthy trial transcript, the isolated instances to which "objection can reasonably be made" are, if any, few and far between. *United States v. Poland*, 659 F.2d 884, 894 (9th Cir. 1981) (per curiam); *see also Scott*, 642 F.3d at 800 (noting that trial judge's questioning, which "comprised less than 20 pages of a 1291-page trial transcript . . . did not preempt counsel's examination"). Indeed, this Court has declined to reverse a jury verdict even where a district court "interrupted and admonished defense counsel over a hundred times during the course of a week-long trial" and "many of the judge's comments and interventions were inconsistent with standards of judicial decorum." *Scott*, 642 F.3d at 799. Furthermore, defense counsel in most instances took the opportunity to rectify any issues the court's interventions raised. *See, e.g.*, ER

74

1313 (clarifying testimony about ultrasounds); ER 1260 (clarifying substance of Pogosyan's testimony); ER 1274 (Glazer explains that hospice director "with his experience" is the "final arbiter" of whether a patient needs hospice care).

In addition, the district court specifically instructed the jury "not [to] read . . . into anything [the court] may have said or done, any suggestion as to what verdict you should return." ER 1598. This Court has held that such instructions can "alleviate any appearance of impartiality the judge's questioning may have conveyed." *Scott*, 642 F.3d at 800 (internal quotation marks and brackets omitted); *see also Morgan*, 376 F.3d at 1008 ("Even in cases where a judge's participation in a trial is 'extreme,' that participation generally does not warrant reversal if a later curative instruction is given."); *United States v. Pisani*, 773 F.2d 397, 404 (9th Cir. 1985) (holding that prejudicial effect of judge's comments was mitigated by curative instructions). Indeed, the verdict itself confirms that the jury did not succumb to prejudice because it acquitted Glazer on one count. Dkt. 371, at 4. As this Court has explained, such nuance in the jury's verdict is probative of "independence" and weighs against a finding that any judicial misconduct was prejudicial. *See Scott*, 642 F.3d at 800.

Finally, as set forth above, *see* pages 59-61 *supra*, the evidence of Glazer's guilt was overwhelming. He cannot establish reversible error especially under a plain error standard; indeed, he has not even attempted to satisfy his burden

beyond the first prong of the plain error test. His argument that the district judge's intervention constituted structural error is also wrong. None of the cases he cites stands for that proposition, and this Court has consistently considered whether the alleged misconduct prejudiced the defendant. *See*, *e.g.*, *Scott*, 642 F.3d at 799.[15]

## VII.  The District Court's Evidentiary Rulings Were Not An Abuse Of Discretion.

(Glazer Claim D)

Glazer argues that the district court made "multiple" evidentiary errors that "cumulatively" require reversal. At the outset, this Court need not reach the merits of his claims because any error in the rulings, viewed either individually or cumulatively, was harmless. *See United States v. Bishop*, 1 F.3d 910, 911 (9th Cir. 1993) (explaining that the Court need not reach the merits of the claim that the evidence was inadmissible because any error was harmless). In any event, none has merit.

---

[15] Because the court's analysis necessarily turns on defendant-specific facts, Merino's one-sentence joinder in Glazer's claims is insufficient. *See* page 45 *supra*. That is especially so here, where Glazer's complaints are all based on the court's comments during his defense case.

## A.      Standard of review

This Court reviews "objected to" evidentiary rulings for abuse of discretion, and "unobjected to" evidentiary rulings for plain error. *United States v. Torralba-Mendia*, 784 F.3d 652, 659 (9th Cir. 2015). The Court will find an abuse of discretion "only when [it] ha[s] a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Thornhill*, 940 F.3d 1114, 1117 (9th Cir. 2019) (internal quotation marks omitted).

## B.      The district court did not err, plainly or otherwise, by granting the government's motion in limine to exclude evidence of legitimate medical services

1. The government filed a motion in limine to exclude evidence that Glazer provided legitimate medical services "outside of the counts in the indictment." Glazer ER 567-69. Although Glazer apparently objected to the motion when he conferred with the government in advance of the filing, *see* Glazer ER 567 n.1, he did not file a written opposition with the court.

At a pretrial hearing on the government's motion, the court preliminarily stated that it was inclined to agree with the government that instances of proper conduct are "irrelevant" until the time the court is required "to put a number on what the damages have been." Glazer ER 561. In response to the court's invitation to "chime in," Glazer "agree[d] that the correct billing clients is not relevant to alleged incorrect billing clients," but that he wanted to be able

to ask Glazer "how many patients he has, so that the jury does not believe . . . every single patient he has is a fraudulent patient." Glazer ER 561-62; *see* Glazer ER 562 ("We're not calling any patient to say he's a great doctor, and he took care of me, that is not our intention."). The court granted the government's motion as to "legitimate services." Glazer ER 565.

After the government rested and in the course of discussing whether Glazer's proposed character witnesses had to testify specifically about his character while practicing medicine, defense counsel reminded the court that he had been precluded from introducing testimony about "good examples of his practice" and that "[o]therwise, we'd have 30 witnesses saying this is what he did with me." ER 1048-49; ER 1050 (defense counsel "could have called 1,000 witnesses that said this is what he did with me, but, again, the motion was granted."). Ultimately, the court allowed Glazer to call several character witnesses, who testified about his honesty and integrity as a doctor. *E.g.*, ER 1056-57, 1063-64, 1128-29, 1136.

2. Because Glazer did not object to the court's ruling on the government's in limine motion – indeed, he admitted that evidence of legitimate medical services was not relevant – his claim that the district court erred by excluding such evidence is reviewed for plain error. He has not demonstrated that the district court abused its discretion in granting the

government's motion, let alone plainly so. "A defendant cannot establish his innocence of crime by showing that he did not commit similar crimes on other occasions." *Herzog v. United States*, 226 F.2d 561, 565 (9th Cir. 1955) (upholding exclusion of such evidence as immaterial); *accord United States v. Lane*, 323 F.3d 568, 584 (7th Cir. 2003) (upholding exclusion of such evidence as not relevant); *see also United States v. Whitfield*, 590 F.3d 325, 361 (5th Cir. 2009) (noting that courts have held that "evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant") (quoting *United States v. Dobbs*, 506 F.2d 445, 447 (5th Cir. 1975)).

The cases that Glazer cites are distinguishable. In *United States v. Thomas*, 134 F.3d 975, 978-80 (9th Cir. 1998), this Court held that evidence of a defendant's prior good acts was relevant to prove a lack of predisposition in support of his entrapment defense. In *United States v. Sternstein*, 596 F.2d 528, 530-31 (2d Cir. 1979), a tax fraud case, the court of appeals concluded that the government should have disclosed exculpatory information that established that, out of 900 tax returns that the defendant prepared, only nine contained false deductions, and that the information would have supported Sternstein's defense that the few false returns were innocently or mistakenly prepared. Glazer had no such defense here, and any evidence that he did not fraudulently bill Medicare for some of his patients or fraudulently refer other

patients for home health care and the like was not relevant to whether he committed the fraudulent conduct charged in the indictment.

Finally, in *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997), this Court noted that it had "serious misgivings" about the district court's ruling that limited the number of patients the defense could call "to rebut the government's theory that [the defendant ophthalmologist's] practice was 'permeated with fraud,'" but that any error would have been harmless because the government did not prove its "permeated with fraud" theory. *Id.* at 1280. The government's "permeated with fraud" theory, in turn, was not simply that the defendant submitted many fraudulent claims, as was the case here. Instead, the government pressed that theory because it could not otherwise identify the fraud proceeds that had been commingled with legitimate funds and the amount had sentencing consequences.

### C. The district court did not abuse its discretion by barring Glazer from testifying from his notes

1. Before Glazer began testifying, the government brought to the court's attention that Glazer wanted to testify from notes he had prepared from the patient files, and it objected "to him testifying on the stand with his notes." ER 1141. Defense counsel explained that Glazer had reviewed the voluminous files and made notes as to what was in them and that it would save time if he could simply refer to his notes rather than first establish that he did not recall

the contents of the files. ER 1141-42. In response to the court's concern that "we have no idea and no way of knowing the accuracy of these notes," defense counsel stated that "[h]e's going to testify in the same way that he would testify under oath"; that "[t]he accuracy is based on his review of the file"; and that testifying from the notes is "the same as his testimony in looking" at the files. ER 1142. Given that choice, the court stated that "let's do his testimony then." ER 1142. The court added that, if Glazer intended to testify about a patient's condition, "we don't need his notes" because he could "call the patient file up," and look at it if he needed to. ER 1142-43.

2. The district court did not abuse its discretion in so ruling. Although it is true that "[a]nything may be used" to refresh a witness's "conscious memory," 3 Mueller & Kirkpatrick, *Federal Evidence*, § 6:93 (4th ed.), it is clear that Glazer did not intend to use the notes to refresh his current recollection, as required under Federal Rule of Evidence 612, but instead to improperly testify from the notes themselves. *See United States v. Carey*, 589 F.3d 187, 190-91 (5th Cir. 2009) ("A witness may not, under the guise of Rule 612, testify directly from a writing."); *United States v. Davi*s, 551 F.2d 233, 235 (8th Cir. 1977) (same); *see also Esperti v. United States*, 406 F.2d 148, 150 (5th Cir. 1969) ("Caution must be exercised to insure that the document is actually being used for purposes of refreshing and not for purposes of putting words in the mouth

of the witness."). Nor did the court need to review the notes themselves to determine whether they were "more like a 'script'" or "more like notes." Br. 32-33. As Glazer himself admitted, he did not recall his examinations or the presenting symptoms of the patients he saw many years ago, and when shown the files, he simply read from them. *E.g.*, ER 1141, 1195, 1244-45, 1248-49, 1255-56, 1264-66. There is no reason to believe that, if the actual files did not refresh Glazer's current recollection, that the notes, whatever their form, would have done so instead. Given the choice between allowing Glazer to testify from the exhibits or from his previously prepared notes from those exhibits, the court correctly required Glazer to testify from the former.

Even if the court abused its discretion, any error would have been harmless because, as Glazer acknowledged, he would have testified "the same way," ER 1142, whether he used the notes or the patient files on which they were based. There is also no support for his claim (Br. 32) that the direct examination was "unwieldy" because he testified from the actual records rather than the notes from those records. If anything, it is the cross-examination that could have become "unwieldly" because the accuracy of the notes – as well as the patients' records – would have been open to question.

**D. The district court did not abuse its discretion in admitting the "education" letter for a limited purpose**

1. At a pretrial hearing, Glazer objected to the admission of the October 2010 "education letter" from SGS, the Medicare contractor, that alerted Glazer to irregularities in his billing practices. Glazer ER 554-56. In response to Glazer's hearsay argument, the government stated that it would not be introducing the document "for the truth of the matter asserted within" but only to show that Glazer was "on notice about certain issues as of that point in time." Glazer ER 556. The court agreed that the letter could not be admitted to prove the truth of the findings in the letter and deferred ruling, Glazer ER 558; it subsequently admitted the letter into evidence "for notice," ER 1398-99.

Fraud investigator Thompson testified that SGS had issued an education letter to Glazer and that the letter "identifie[d] the issues that were found." ER 759. Thompson explained that the purpose of the letter generally is to help the Medicare provider "fix the issues" identified in the letter. ER 761-62; *see also* ER 780-81 (Thompson testifies during cross-examination that the education letter "outlined what the findings were [of SGS's review], as well as then providing the regulations that would apply to those findings and basically let[] them know how that could be fixed").

During his testimony, Glazer denied ever receiving the letter. *E.g.*, ER 1354-55, 1398, 1400-01; *see* ER 1561-62 (Glazer argued in summation that the

letter was admitted for the purpose of showing that SGS "sent a notice to him" but that he never received it because only Avetisyan and Minasyan would have seen the letter and they would have destroyed it). At the conclusion of his testimony, the court instructed the jury that it could not consider the letter "for the truth of anything asserted in that letter" but instead could "only . . . consider that letter as evidence that [Glazer] had been placed on notice of these deficiencies, but not that any of the things that are said in the letter are true." ER 1435-36. In its final charge, the court reminded the jury that, when it has been instructed "to consider certain evidence in a limited way, [the jury] must do so." ER 1461.

2. The district court did not abuse its discretion by admitting the "education" letter for the sole purpose of showing that Glazer was "on notice" of the deficiencies described in the letter. *See United States v. Graf*, 610 F.3d 1148, 1165 (9th Cir. 2010) (stating that attorney's testimony that trade association's health benefits plan did not comply with state and federal law and that marketing them would be a crime was admissible to show that the defendant "was on notice that his conduct was illegal"); *see also, e.g.*, *United States v. Chavis*, 772 F.2d 100, 105 (5th Cir. 1985) (records of complaints to the Better Business Bureau and forwarded to defendant's business were not hearsay and instead showed that defendants were notified of complaints).

Glazer argues (Br. 33) that the contents of the letter "went far beyond the notice theory." That may be so as to SGS's purpose in sending the letter, which was to help Glazer correct the enumerated billing deficiencies in the future. But the jury was instructed that it could only consider the letter to show that Glazer was "put on notice" of those deficiencies. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("[a] jury is presumed to follow its instructions"). Such notice, in turn, was relevant because the government had to prove that Glazer knew that his conduct was unlawful or made himself deliberately blind to the fraud taking place at his clinic.

Citing *United States v. Sine*, 493 F.3d 1021 (9th Cir. 2007), Glazer further contends (Br. 34-35) that there were "evidentiary alternatives" to admitting the letter. The question in *Sine* was whether the district court should have excluded relevant evidence under Fed. R. Evid. 403, and, in conducting the required balancing under that Rule, this Court considered that the government could have proved the relevant facts "through less prejudicial means." 493 F.3d at 1035. But that consideration has no bearing here because Glazer did not object to the admission of the letter under Rule 403. In light of the district court's admonition to the jury, Glazer has not shown that the district court abused its discretion in admitting the evidence for a limited and permissible purpose.

**E.** **The district court did not commit reversible error in admitting portions of the testimony of Investigator Person, Investigator McNulty, and Agent Li**

1. Before trial, the government notified counsel that it intended to call a Medicare representative to testify about the Medicare program, the documentation required to be submitted by the Medicare provider, and "the operations, methods, patterns, and practices of fraudulent health care providers, including the use of marketers to recruit patients." Dkt. 203-1. The government provided the witness's name, qualifications, and other cases in which the witness had testified. *Id*; Dkt. 208, at 3 n.1 (notifying counsel that witness previously identified had retired and providing information about replacement witness, Brent Person). Merino moved to exclude the testimony about those "operations, methods, patterns, and practices," especially as it pertained to "the use of marketers." Dkt. 203 (emphasis omitted); ER 83-84. Glazer did not object to the testimony. The district court denied Merino's motion. ER 92-93.[16]

Person, an experienced fraud investigator with the Center for Medicare Services, ER 241-43, testified about basic features of the Medicare program relevant to this case: the claims submission process; the general rules and

---

[16] Neither Merino nor the court found it significant to decide whether Person was testifying as an "expert." ER 83, 91.

requirements applicable to doctors, DME suppliers, and home health care and hospice providers with respect to billing for items and services; the materiality of certain false statements made to Medicare; and the prohibition on paying kickbacks in exchange for patient referrals. *E.g.*, ER 246, 249-51, 255, 272-76, 279-80, 291-92, 300. He also described certain "red flags" that, based on "a multitude of data elements," "could be indications of fraud." ER 298-300 (mentioning, among other indications, frequent billing for allergy testing, sleep studies, and bladder emptying procedures). He explained that "[n]ot every red flag" "mean[s] that there has been a wrongdoing" or results in criminal or civil charges. ER 321. Person also described case-specific exhibits, such as Glazer's and Fifth Avenue's Medicare enrollment applications, ER 247-54, and summary charts documenting the voluminous claims data, ER 277-81.

Person testified briefly about his own interactions with Glazer. He stated that he accompanied SGS contractors on a site visit to Glazer's clinic in 2012, and he described Glazer's office and his demeanor ("visibly uncomfortable") while being questioned about the bladder emptying procedure for which he had submitted claims to Medicare. ER 301-02; ER 302-03 (Glazer "wasn't familiar with the procedure"; "he couldn't locate the equipment that performed the procedure"; and he referred the examiners to his office manager, which Person thought "was unusual"). Person also testified during redirect

examination that Glazer had been informed of the results of the on-site investigation and that he had been placed on pre-payment review. ER 372-74.

Stephen McNulty, who had previously worked as an SGS fraud investigator, testified in more detail about the 2012 site visit. ER 793-819. McNulty described Glazer's definition of "homebound," and the government then asked McNulty whether, based on his nine-plus years as a fraud investigator, he had "an understanding of what it is for the patient to be homebound." ER 805-06. After McNulty responded that he did, the government asked whether the witness's understanding of the term "comport[ed] with" Glazer's response. ER 806. The court overruled Glazer's objection to the testimony as "[i]mproper 702 expert opinion" and permitted McNulty to answer. ER 806. McNulty also testified, over objection, that Glazer's not "know[ing] how [his] office is running, not being able to provide that information, that is a red flag." ER 819.

The FBI case agent, Agent Li, testified about the investigation, including obtaining and executing search warrants for Glazer's clinic and Fifth Avenue. She explained that, after interviewing Medicare beneficiaries and obtaining Medicare and bank records, the agents wanted to search the two businesses to corroborate the information they already had obtained, to compare the patient files to Medicare claims data, and to determine whether the information in the

patient files was consistent with records from the patients' primary care physicians. ER 923-24. The district court overruled Glazer's objection to the relevance of that testimony, stating that it was "important that the jury know that certain legal requirements have been complied with before they descended upon anyone's office and began seizing records." ER 924.

Agent Li then described the items seized pursuant to the two search warrants. ER 926-45, 947-63. In response to a question whether, in addition to seizing patient files, agents seized "other documents that indicated fraud," the case agent testified about items that were seized from Fifth Avenue, including "marketer logs," "payment receipts for marketers," and "pre-signed forms." ER 956-57; *see also* ER 959 (describing hospice certification form with only patient's name and doctor's signature that was seized from clinic). She explained that the pre-signed hospice certifications and home health care visit sheets were "indicator[s] of fraud" because "in [her] experience, you do not have patients sign blank forms prior to a visit actually occurring." ER 960.

2. Glazer contends (Br. 35-36) that the district court erred by overruling his objection to McNulty's testimony defining "homebound." Although he now claims (Br. 36) that his objection triggered the court's obligation to "exercise its gatekeeper role" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), it is not clear that his four-word objection raised a

*Daubert*-type inquiry into the admissibility of the testimony as opposed to a challenge to the reliability of McNulty's opinion. *See United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (rejecting defendant's *Daubert* challenge to agent's testimony about gangs; "The *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."); *United States v. Anieze-Smith*, 770 F. App'x 342, 344-45 (9th Cir.) (unpublished) (stating that defendant's challenge to reliability of agent's expert opinion testimony "goes to the weight, and not to the admissibility" of the testimony), *cert. denied*, 140 S. Ct. 613 (2019). But even assuming that McNulty's understanding of the term was admitted in violation of *Daubert* or Fed. R. Evid. 702, the admission of the testimony -- which amounted to two paragraphs of transcript -- was harmless because, as an experienced fraud investigator, McNulty was indeed qualified to give expert testimony on the meaning of the term, *see United States v. Gadson*, 763 F.3d 1189, 1213 n.10 (9th Cir. 2014), and because Investigator Person testified on the same topic, *see* ER 288-92, 361-62. Furthermore, although the government's questions apparently were aimed at juxtaposing Glazer's definition of "homebound" with that of McNulty's, the two were not far off. *See* ER 805-06.

3. Glazer next argues (Br. 36-38), for the first time on appeal, that Investigators McNulty and Person offered "[c]ombined expert and fact" testimony and that the district court failed to take the appropriate precautions when a witness provides such "'dual role testimony.'" He has not demonstrated that the district court's failure to give a dual role instruction *sua sponte* was plainly erroneous.

This Court has cautioned district courts about the dangers of permitting investigating agents to testify as both an expert and a percipient witness. *See, e.g.*, *Torralba-Mendia*, 784 F.3d at 658-59; *United States v. Vera*, 770 F.3d 1232, 1246 (9th Cir. 2014) (plain error not to give dual role instruction where case agent, who was originally designated as percipient witness then redesignated as expert, lapsed into lay opinion on the specific drug quantities in the case). Nonetheless, this Court also has reasoned that "the use of case agents as both expert and lay witnesses is not so inherently suspect that it should be categorically prohibited." *United States v. Anchrum*, 590 F.3d 795, 803 (9th Cir. 2009) (quoting *United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007)).

The district court's failure to explain to the jury the investigators' purported dual roles was not plainly erroneous. McNulty testified almost exclusively as a percipient witness, and any error in admitting his brief testimony about his understanding of the term "homebound" was harmless.

*See* page 90 *supra*; *see also Gadson*, 763 F.3d at 1213 (noting that testimony of lay witness who relied on his training and experience to define single drug term did not raise the dual-role concerns identified in *Freeman*).

Glazer's challenges to Investigator Person's testimony are also without merit. Person testified primarily as an expert witness and testified only briefly about his encounter with Glazer during the 2012 site visit. Contrary to Glazer's claim, Person's description of the site visit was segregated from his testimony as an expert and consisted of three transcript pages at the end of his direct examination. ER 301-03. *See Torralba-Mendia*, 784 F.3d at 661 (stating that defendant "has not shown the absence of a curative instruction affected the outcome of the trial" because, among other reasons, "the government bifurcated [the agent's] testimony between his expert testimony and percipient observations"); *Anchrum*, 590 F.3d at 804 ("When the district court divided [agent's] testimony into two separate phases it avoided blurring the distinction between [agent's] distinct role as a lay witness and his role as an expert witness."). The testimony also was relatively insignificant as compared to the testimony of Investigators Thompson and McNulty, who described the site visit – and Glazer's inability to answer most of their questions about the operation of his practice – in greater detail. Nor was there a danger that the jury would give "unmerited credibility," *Vera*, 770 F.3d at 1242, to

92

Investigator's Person's testimony about the enrollment applications and summary charts because he merely described exhibits that had been admitted, without objection, before trial. Dkt. 515, at 35; ER 247, 278-79.

Glazer also claims (Br. 37) that the foundation for Person's expert opinions "was not particularly strong," quoting snippets of Person's testimony taken out of context. *See* ER 242 (after Person described his 20-year experience in investigating fraud and abuse, he was asked whether it was "fair to say that [he was] pretty familiar with the Medicare program" and he admitted "Yeah, I'm pretty familiar with it."); ER 297 (Person testified that Medicare Part B pays for an EKG and that, although he did not recall all of the circumstances in which Medicare would pay, "there must be a medical need for it"). That challenge to Person's expertise has no bearing on the "dual testimony" issue, and Glazer, who had ample notice of Person's qualifications, never questioned Person's expertise below.

4. Glazer argues (Br. 40-41) that the district court erred by permitting Investigators Person and McNulty to testify about "'red flags'" that are indications of fraud and Agent Li to identify documents that "indicated fraud." Admission of the testimony was not error, let alone plain error.[17] "The federal

---

[17] Glazer acknowledges (Br. 40 n.4) that he did not object to Investigator Person's and Agent Li's testimony.

courts uniformly hold . . . that government agents or similar persons may testify as to the general practices of criminals to establish the defendants' modus operandi. Such evidence helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior." *United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984); *see also*, *e.g.*, *Anieze-Smith*, 770 F. App'x at 344-45 (concluding that the district court did not abuse its discretion by admitting evidence on the modus operandi of typical DME Medicare fraud schemes); *United States v. Tcherniavsky*, 708 F. App'x 444, 445 (9th Cir. 2018) (unpublished) (same).

The "red flag" testimony primarily pertained to the characteristics associated generally with Medicare fraud schemes, and, as Glazer concedes, the investigators did not opine on Glazer's guilt. *Cf. United States v. Alonso*, 48 F.3d 1536, 1541 (9th Cir. 1995) (emphasizing that "[witness's] opinion that [defendant] was engaged in 'illegal activity' simply does not constitute an opinion that [defendant] was guilty of the crimes charged"); *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990) (holding that expert must offer his direct opinion of defendant's guilt to violate Rule 704(b), not just the general practice of drug operatives). Glazer argues nonetheless (Br. 40-41) that the witnesses' testimony is distinguishable from the expert testimony that this

Court has found unobjectionable because the witnesses merely stated "just the opinions that there were 'red flags,' or 'indications of fraud.'" The record belies that characterization of the testimony and instead reveals that witnesses explained why particular practices and documents were indicative of fraud or otherwise suspicious. *See, e.g.*, ER 298-99, 819, 960, 962, 982, 995.

Finally, even if the court abused its discretion by admitting the challenged testimony, Glazer has not demonstrated that the errors were "plain" in light of the decisions summarized above. He also has not shown that the errors affected his substantial rights. Even without the witnesses' testimony, the government would have persuasively argued to the jury that Glazer engaged in highly suspect practices, including by writing medically unnecessary prescriptions, adding false information to the patients' files, and referring large numbers of patients to health care providers that were themselves engaged in fraud. And, as discussed above, the government presented overwhelming evidence, separate and apart from the investigators' challenged testimony, that Glazer engaged in an extensive fraud against Medicare.

5. Glazer contends (Br. 41-42) that the district court abused its discretion by admitting Agent Li's testimony about the reasons the agents applied for a search warrant. The district court reasonably concluded that, where a doctor's

office was searched and confidential files were seized, it was "important that the jury know that certain legal requirements have been complied with before they descended upon anyone's office and began seizing records." ER 924. Furthermore, although there is a risk that, in describing the steps of a police investigation, the witness will testify about out-of-court statements in violation of the hearsay rule, *see United States v. Johnson*, 875 F.3d 1265, 1279 (9th Cir. 2017), Agent Li did not do so here, as Glazer acknowledges. Glazer does argue, though, that Agent Li "strongly implied," Br. 41, that the patients reported during their interviews that they did not receive the various medical services that were documented in their files by testifying that there were "allegations of services not rendered," ER 917, and that agents had "probable cause to execute a search warrant." ER 923. But to the extent Li's testimony so implied, its admission was harmless because Glazer had the opportunity to confront the patients and they testified to the same thing.

**F.     The district court did not abuse its discretion by denying Glazer's motion to introduce a Medicare regulation**

1. Investigator Person testified that Medicare requires a doctor to certify that a patient is terminally ill to qualify for hospice care. ER 301. During cross-examination, he disagreed with Glazer that, in addition to the referring doctor, a hospice doctor also had to certify the patient's terminal illness and that, in this case, only Glazer had to "[i]nitially" certify the terminal illness. ER 305-

06. He agreed, though, that a hospice doctor would need to certify the subsequent hospice periods. ER 306. Person admitted that the Code of Federal Regulations is the "ultimate authority" on the certification requirements and that he probably looked at "Regulation 418.22, certification of terminal illness," "[a]t some point" but that he does not "memorize the citations." ER 354.

Several days later, during Glazer's defense case, the government informed the court that it had just received three exhibits that Glazer intended to introduce, including a printout of the Medicare regulation referenced by Person that pertained to the certification requirements for admission to hospice care. ER 1302. In response to the government's objection to admitting the regulation on relevance grounds, Glazer argued that it showed that Glazer was only required to certify the need for hospice care for the initial period, that hospice physicians must recertify the need for additional periods of care ("after six months, it's not up to [Glazer]"), and that Investigator Person was "wrong according to the regulations." ER 1309-10. The district court sustained the government's objection, stating that "[t]here is no evidence that hospice [care] was ever provided to anyone . . . [s]o recertification and all of this, this has got nothing to do with this case. Those regulations have nothing to do with this case." ER 1311.

2. Glazer contends that the district court erred by excluding the evidence because the regulation would have shown that Investigator Person "was mistaken in his testimony about hospice requirements." Br. 39. The regulation was inadmissible on that ground, however, because, at most, it contradicted Person's testimony on a collateral matter during his cross-examination. *See Ortiz v. Yates*, 704 F.3d 1026, 1038 (9th Cir. 2012) ("As a general matter, a witness may not be contradicted by extrinsic evidence on a collateral matter."); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 (9th Cir. 2006) (impeachment by contradiction also comes with the "important limitation" that "the statements in issue [have] been volunteered on *direct* examination"), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). Moreover, even if Glazer had demonstrated that Person was wrong in stating that the hospice doctor did not become involved in the initial certification process, that mistake was irrelevant in this case because Glazer, as the referring doctor, *was* required to certify that his patient met the eligibility requirements for hospice care.[18]

---

[18] Glazer also appears to argue that the court erred by relying solely on Stepan Pogosyan's testimony that his father never received the hospice care that Glazer ordered. According to Glazer, his other hospice-referred patients "might have actually received hospice care." Br. 39. While that may be so, the regulation itself does not shed light on that issue.

Any error in excluding the regulation was also harmless. Its substance was admitted through other evidence, *see* ER 985; SER 21-24; Person's purported mistake was insignificant; and the evidence against Glazer was overwhelming.

### G. The district court did not abuse its discretion by permitting Agent Li to testify that she did not find "indicators" that signatures were traced

1. Agent Li testified that the agents recovered a "light box" during the search of the Fifth Avenue office. ER 927-28. She explained that the device can be used to trace items but that she did not find "any obvious signs of tracing in or near this location." ER 928. On cross-examination, Agent Li stated that she had seen light machines before and that they can be used to trace someone else's signature. ER 991. In response to the government's follow-up questions on redirect examination, Agent Li testified, over objection, that she did not find "any indicators of duplicate signatures" in the patient files or the other documents that were seized pursuant to the search warrants. ER 996-97. She explained that, "[b]ased on [her] experience, when items have been traced in the past, the signature is not fluid." ER 997 (witness adds that "[i]t appears – you stop and start because that is not your signature, so you are not used to the curves or the way the signature goes on a paper. So I didn't find evidence of that."). The district court overruled Glazer's objection that Agent Li was

stating an improper expert opinion. ER 997 ("That is not even an expert, that is common knowledge.").

2. The district court did not err by permitting Agent Li to testify that she did not see any "indicators" that Glazer's signatures on various documents were traced. For the most part, Agent Li simply reported her observations of the documents that she had reviewed – *i.e.,* that the signatures did not appear to have "stop[s]" and "start[s]" but instead appeared "fluid." ER 997. To the extent that she opined in passing on the characteristics of traced signatures, the district court did not abuse its discretion in admitting that testimony, which was based on "common knowledge" rather than an "expert" opinion. ER 997. In a related context, this Court has repeatedly held that jurors may make handwriting comparisons without the benefit of expert testimony.[19] *E.g., United States v. Woodson*, 526 F.2d 550, 551 (9th Cir. 1975) (per curiam); *United States v. Meredith*, 685 F.3d 814, 824 (9th Cir. 2012); *United States v. Alvarez-Farfan*, 338 F.3d 1043, 1045 (9th Cir. 2003).[20] Thus, even if Agent Li's description of

---

[19] The only exception is when "the authenticity of the handwriting is the primary issue in the case, as where forgery is alleged." *United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir. 1986). Glazer was not charged with forgery, so that exception does not apply here.

[20] Nor is *United States v. Prime*, 431 F.3d 1147 (9th Cir. 2005), contrary to those decisions. In that case, the government chose to rely on expert testimony, and

the characteristics of a traced signature should not have been admitted, the jury could compare – indeed, was "obliged to" compare – any questioned documents for itself.[21] *See United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir. 1986). Furthermore, as even Glazer pointed out during his summation, the "Glazer" signatures on the various documents "seemed to be different," ER 1557, confirming that they were not traced.

Any error in admitting Agent Li's brief testimony about tracing also was harmless. The authenticity of Glazer's signatures was not a significant issue because, even when Glazer testified that he could not be certain that the signatures on the various orders and referrals were his, he did not dispute that he had ordered the tests and services at issue in this case; to the contrary, he justified them by relying on the information that he had falsely included in the

the question before the Court was whether the expert's testimony satisfied *Daubert*.

[21] Glazer cites (Br. 44) experts' testimony in two state intermediate court decisions to support his view that Agent Li's description of the characteristics of traced signatures is wrong. Those cases do not purport to describe the characteristics of a traced writing, and other experts have come out the other way. *See United States v. Spaar*, 748 F.2d 1249, 1251 (8th Cir. 1984) (handwriting expert testified that, in his opinion, disputed signature "had all the signs of a tracing: heavy and deliberate strokes, blunt beginning and ending strokes, and a shaky quality throughout, while genuine signatures, in contrast, are smoothly and freely written"); *see also* Glazer Br. 45 (describing characteristics of "'tremor of fraud'" that are consistent with Agent Li's testimony).

patients' files *See, e.g.*, ER 1196-97, 1223-24, 1252, 1254, 1317-18. In addition, although the pre-signed forms were indeed further evidence of the fraud, Glazer overstates the significance of that evidence when he claims that "[t]he most incriminating documentary evidence was Dr. Glazer's signatures on blank forms and referrals for home health care that was billed, but . . . never provided." Br. 46. In fact, most of those forms were seized not from the Glazer Clinic but from the Fifth Avenue office, as Glazer emphasized during his cross-examination of Agent Li. ER 957-59, 989, 991-92. Nor did the government rely on Agent Li's testimony to rebut Glazer's argument in summation that Avetisyan used the light machine to trace Glazer's signature. ER 1557.

## VIII. Defendants Have Not Shown Cumulative Error Requiring Reversal Of Their Convictions.

(Merino Claim IV; Glazer Claim 8)

Defendants contend (Merino Br. 48-49; Glazer Br. 45-47) that the alleged errors, viewed cumulatively, warrant reversal. Their cumulative-error arguments fare no better than the individual claims on which they are based.

To demonstrate cumulative error warranting reversal, a defendant must establish "multiple errors," *Macias*, 789 F.3d at 1023-24, which collectively were "so prejudicial as to require reversal," *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993). A defendant cannot obtain reversal based on

cumulative error by asserting a long list of claimed errors that either were not error at all or, at most, were harmless. *See United States v. Lindsey*, 634 F.3d 541, 555 (9th Cir. 2011) (argument that cumulative effect of multiple errors warrants reversal is "without merit" where "many of [the defendant's] alleged errors are not errors at all"); *United States v. Fernandez*, 388 F.3d 1199, 1256-57 (9th Cir. 2004) ("To the extent that [this Court finds] that any claimed error of the district court was harmless, or that claimed error did not rise to the level of plain error, . . . the cumulative effect of such claimed errors is also harmless because it is more probable than not that, taken together, they did not materially affect the verdict"). When there is "ample evidence of [a defendant's] guilt," this Court will not reverse for cumulative error. *Wilkes*, 662 F.3d at 543 ("[I]n contrast to this circuit's cases that reversed a defendant's convictions based on cumulative error, the government in this case presented ample evidence of Wilkes's guilt.").

None of the errors defendants allege, even when viewed collectively, justifies reversal of their convictions. As to Merino, there was, at most, only one instructional error, and, even assuming that the court erred in its phrasing of the intent-to-defraud element in the disjunctive rather than conjunctive, that error was harmless beyond a reasonable doubt. Glazer's claimed errors are either without merit entirely, harmless, not plainly erroneous, or arguably even

waived (*i.e.*, his claims regarding the selection of the alternate jurors and the exclusion of evidence that some patients may have received legitimate medical services). And reversal is especially unwarranted because the evidence against Glazer was overwhelming, making it "more probable than not," *Fernandez*, 388 F.3d at 1257, that the cumulative effect of the claimed errors did not materially affect the verdict.

## IX. Merino's Within-Guidelines Sentence of 21 Months' Imprisonment Was Procedurally and Substantively Reasonable.

(Merino Claim V)

Merino argues (Br. 49-56) that the district court erred in declining to give her a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, and that her sentence was procedurally and substantively unreasonable. Those claims are unsupported.

### A. Background

Applying the 2018 version of the United States Sentencing Guidelines, the probation officer calculated a total offense level of 16, Presentence Investigation Report (PSR) ¶ 47, and an advisory guidelines range of 21 to 27 months of imprisonment, *id.* at ¶ 119. The probation officer recommended a variance sentence of 15 months' imprisonment, based on the facts that (1) Merino suffered from anxiety, which would make imprisonment "considerably more difficult for her than for people not afflicted with that condition"; (2) she

has "worked hard her whole life to support her family" at legitimate jobs and "her only involvement in the medical field was during this case"; her involvement was "more profitable to Avetisyan than it was to Merino"; and she has "never lived more than a modest lifestyle." Dkt. 422, at 5; *see also* PSR ¶¶ 68-69, 74, 78-86, 91-92, 133 (describing Merino's background, health conditions, and death of her adult son). As relevant here, Merino objected to the PSR's failure to credit her with acceptance of responsibility because she "never contested her receipt of payments in exchange for recruiting patients." ER 1651.

At sentencing, the district court rejected Merino's argument that she was entitled to a downward adjustment for acceptance of responsibility. ER 1735-36 (explaining that Merino has never expressed "any acceptance of responsibility either to the probation officer that interviewed her or certainly not to the Court"). The court also declined to impose a below-guidelines sentence. It noted that it had reviewed beforehand the parties' submissions, and it specifically recited Merino's background and personal characteristics, ER 1720, 1750-52. The court stated that it was "obligated to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of 3553(a)(2)," and that it considered those factors in imposing a 21-month sentence. ER 1749-50.

At the close of the sentencing hearing, Merino objected to the 21-month sentence as "substanti[vely] unreasonable" to "preserve that issue for appeal; but otherwise nothing." ER 1754.

## B.    Standard of review

This Court reviews the procedural and substantive reasonableness of a sentence for abuse of discretion. *Kleinman*, 880 F.3d at 1040. "Although [the Court has] decline[d] to embrace a presumption of reasonableness for in-Guideline sentences, when a sentence is within Guidelines, it is generally probable that the sentence is reasonable." *Id.* (internal quotation marks omitted). "Where . . . a defendant failed to object on the ground that the district court erred procedurally in explaining and applying the [18 U.S.C.] § 3553(a) factors, [the Court] review[s] only for plain error." *United States v. Valencia-Barragan*, 608 F.3d 1103, 1108 (9th Cir. 2010).

A district court's decision about whether a defendant has accepted responsibility is a factual determination reviewed for clear error. *United States v. Green*, 940 F.3d 1038, 1041 (9th Cir. 2019). "In reviewing a district court's determination as to a defendant's acceptance of responsibility, [the Court] afford[s] the district court great deference because of its unique position to evaluate a defendant's acceptance of responsibility." *United States v. Scrivener*, 189 F.3d 944, 947-48 (9th Cir. 1999) (internal quotation marks omitted).

**C.    The district court did not clearly err in denying Merino credit for acceptance of responsibility**

Merino has not demonstrated that the district court committed clear error in denying her credit for acceptance of responsibility. She was not entitled to the two-level reduction under U.S.S.G. § 3E1.1(a) because, contrary to her argument, her case was not one of the "rare situations" in which she went to trial "to assert and preserve issues that [did] not relate to factual guilt." U.S.S.G. § 3E1.1 cmt. n.2. It is beyond question that she was not entitled to the additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b) because she did not "timely notif[y] authorities of [her] intention to enter a plea of guilty," and the government accordingly did not file the required motion, *id.* Thus, while Merino asserts that she never contested that she accepted payments for recruiting patients (and even then, she has never admitted that she did so unlawfully), she challenged the factual basis of her guilt on the charged offenses by claiming at trial that she did not knowingly participate in a scheme to defraud Medicare and that she lacked an intent to defraud. *E.g.*, ER 1539-42; ER 1541 (arguing in summation that "this case is about as to Ms. Merino whether or not she acted knowingly, intentionally, and voluntarily with the intent to defraud"); ER 1542 ("because we know from the evidence that you heard that Ms. Merino did not know, never mind beyond a reasonable doubt, about the billings for services. She did not know. It has not been proven.").

In similar circumstances, this Court has affirmed a district court's denial of an acceptance-of-responsibility reduction. *See, e.g.*, *United States v. Diaz-Cardenas*, 351 F.3d 404, 408 (9th Cir. 2003) (district court correctly declined to give a downward adjustment for acceptance of responsibility because defendant "never admitted his guilt and contested the element of knowledge at trial"); *United States v. Chastain*, 84 F.3d 321, 324 & n.3 (9th Cir. 1996) (although defendant admitted that he had tax liability, "[b]ecause [h]e attacked the government's proof on willfulness, which is a specific, factual element of a § 7203 offense, he was not in one of the 'rare situations' that would qualify him for a reduction under Guideline § 3E1.1"). Here too, Merino never admitted the essential factual elements comprising the charged health care fraud offenses; she has never accepted responsibility for her crimes; she lied to Agent Li about the payments she received for recruiting patients; and she disputes the sufficiency of the evidence on appeal.

This case is also unlike those that Merino relies on. In *United States v. McKinney*, 15 F.3d 849 (9th Cir. 1994), the defendant "fully confessed," immediately "revealed the location of the gun" used in the robbery, "was cooperative and remorseful," and attempted to plead guilty before trial but was rebuffed by the trial judge. *Id.* at 850, 852-53. In *United States v. Fells*, 78 F.3d 168 (5th Cir. 1996), the defendant "freely admitted all the facts but challenged

their legal interpretation." *Id.* at 172. Moreover, in that case (and unlike here), the district court "categorical[ly]" denied the reduction solely because the defendant "put the prosecution to its burden of proof at trial." *Id.* at 171-72.

### D. Merino's 21-month term of imprisonment was not procedurally or substantively unreasonable

In her remaining procedural-unreasonableness arguments, Merino appears to contend that the district court treated the guidelines "as if they were still mandatory" and did not adequately explain its application of the sentencing factors in Section 3553(a). Br. 51. Merino did not object on those grounds in the district court, and she has not demonstrated that the district court committed any procedural error, let alone one that is plain. Her first argument is clearly unsupported: the district court mentioned that it considered all the Section 3553(a) sentencing factors, including "the various kinds of sentences available as well as the guideline sentencing range," ER 1750, and it explicitly stated that "just because [a sentence is] within the guidelines does not make it reasonable," ER 1731-32; *see also* ER 1733 (agreeing with defense counsel that the Supreme Court "has said these guidelines do not serve the purpose of individualized sentencing" and "[t]hat is why *Booker* came into effect").

Nor was the court's explanation inadequate. "[A] district court need not give an elaborate explanation of its reasons for accepting or rejecting [a

defendant's sentencing] arguments." *United States v. Emmett*, 749 F.3d 817, 821-22 (9th Cir. 2014). That is particularly true of a within-Guidelines sentence, like Merino's, which "often needs little explanation." *United States v. Vasquez-Perez*, 742 F.3d 896, 900 (9th Cir. 2014). Although "[t]he required explanation is most helpful when it comes from the bench," an "adequate explanation in some cases may also be inferred from the record as a whole." *Emmett*, 749 F.3d at 821 (cleaned up); *accord Vasquez-Perez*, 742 F.3d at 900.

Here, the district court stated that it reviewed the parties' submissions, which included the government's 51-page sentencing memorandum and supporting attachments providing a justification for its recommended sentence, listened to arguments from both sides, and considered the various sentencing recommendations (probation on Merino's part, 27 months' imprisonment on the government's part, and 15 months on Probation's, ER 1736-38). It explicitly stated that it considered the factors specified in Section 3553(a). And, although Merino criticizes the district court for asking rhetorically whether the parties have "ever noticed that [the parsimony principle in Section 3553(a)] isn't a terribly helpful mandate," ER 1725-26, the court, in fact, discussed that mandate at length with defense counsel and how it applied to Merino, ER 1727-33.

Contrary to Merino's claim, the district court considered her individual characteristics, but it disagreed with Merino's view of their weight. *See* ER 1724-25 (stating that Merino "has had some things happen and she has had a certain amount of unpleasantness in her life" but found those not "particularly noteworthy or more than" "the various forms of adversity" that the average person may experience). The court added that Merino's "drag[ging] [her] children into [the criminal conduct] is a bit reprehensible and cannot be excused because you had a rough childhood." ER 1725. On the other side of its balancing, the court considered that "but for [Merino's] participation and involvement in securing beneficiaries, this thing would go nowhere." ER 1724; *see also* ER 1741 (noting, when discussing restitution, Merino's "indispensable role in this scheme"); ER 1743 (stating that Merino "was an integral cog in this particular wheel"). Other reasons for the sentence also can be inferred from the record, including, as the government argued, that Merino was involved in this fraudulent scheme for at least six years, she agreed to hide her involvement by claiming that she merely handed out flyers, and she lied when questioned by the FBI. ER 1699-1700, 1722-23.

Merino's challenge to the substantive reasonableness of the sentence is similarly without merit. She argues that the 21-month sentence, which was at the bottom of the advisory guidelines range, was substantively unreasonable in

light of her "personal history and characteristics." Br. 54. But "[t]he weight to be given the various [section 3553(a)] factors in a particular case is for the discretion of the district court," *United States v. Gutierrez-Sanchez*, 587 F.3d 904, 908 (9th Cir. 2009), and this Court gives due deference "to the district court's decision that the § 3553(a) factors, on a whole, justify the [imposed sentence]," *Gall v. United States*, 552 U.S. 38, 51 (2007). Here, the district court listened to Merino's arguments for leniency and was aware of the Probation Officer's recommendation and reasoning but determined that a within-guidelines sentence was appropriate "for this defendant under the present circumstances." ER 1753. *See Valencia-Barragan*, 608 F.3d at 1108 (a district court does not abuse its discretion when it "listens to the defendant's arguments and then simply finds the circumstances insufficient to warrant a sentence lower than the Guidelines range") (internal quotation marks and brackets omitted).

Merino argues (Br. 55-56) that the district court's mention of a "life of crime," ER 1725, demonstrates that the court failed "to exercise meaningful discretion in sentencing" and appreciate "the reality of the individual pain and hardship" that she endured. The court's comment merely reflected its general observations and did not suggest that Merino had engaged in a life of crime; to the contrary, the court acknowledged that Merino had no prior convictions, ER 1750, and her criminal history category of I likewise reflected her lack of a

criminal record. At the same time, the court could properly consider that Merino's participation in the health fraud scheme was not aberrational in light of the six-year duration of her participation in the scheme.

## X. The District Court Did Not Clearly Err In Enhancing Glazer's Offense Level For His Role In The Offense.

Glazer argues (Br. 47-50) that the district court erred by enhancing his offense level for his role as an organizer or leader of the criminal activity and that it relied on improper factors to support that finding. The district court's role-in-the-offense finding was not clearly erroneous.

### A. Background

The PSR calculated Glazer's total offense level as 31, and his advisory guidelines range as 108 to 135 months of imprisonment. PSR ¶¶ 46, 108. The government objected to the PSR's failure to adjust Glazer's offense level by four levels for his role as an organizer. Dkt. 443, at 33-35.

At sentencing, the court first reviewed the PSR's calculations and, "part[ing] company with Probation," stated that it was applying a four-level enhancement for Glazer's role in the offense as a leader or organizer. Glazer ER 12. Glazer disagreed with that finding, arguing that Avetisyan was "the shot caller," who did "everything" and "got all the money." Glazer ER 16-17. In response to Glazer's description of his own role, the district court offered its "observations," stating that "[t]o say that this man was not the shot caller of a

113

medical office . . . is almost absurd in context." Glazer ER 17. The court elaborated by referring to the attorneys that Glazer "[went] through because he wasn't satisfied with their level of skill in practicing law" and by noting that "during the course of this trial, he ran the defense." Glazer ER 17. The court also stated that, after "watching what he has done in this courtroom, in an area in which he has no real expertise, there is no way [the court] would believe that he would let someone else run his medical office." Glazer ER 17-18; *see also* Glazer ER 18 ("He was the shot caller. He's always the shot caller. Those are just my views."). With the four-level enhancement, Glazer's advisory guidelines range was 168 to 210 months' imprisonment, and the court imposed a variance sentence of 120 months. Glazer ER 34, 36.

## B.    Standard of review

This Court reviews the district court's factual determination that Glazer was an organizer or leader under U.S.S.G. § 3B1.1(a) for clear error. *United States v. Berry*, 258 F.3d 971, 977 (9th Cir. 2001); *United States v. Doe*, 778 F.3d 814, 821 n.2 (9th Cir. 2015) ("Our cases consistently apply the clear error standard of review to [an organizer enhancement]."). A finding is clearly erroneous only if it is illogical, implausible, or without support in inferences that may be drawn from the record. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

**C.  The district court did not clearly err in finding that Glazer was an organizer of the fraud scheme**

To qualify for the four-level adjustment under U.S.S.G. § 3B1.1(a), the defendant must have been "the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The relevant commentary provides guidance on factors a court should consider in making that determination:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n.4.

This scheme involved, at a minimum, Glazer, Avetisyan, Minasyan, O'Brien, Merino, and Merino's two daughters. Accordingly, the number-of-participants requirement was easily satisfied.

Glazer's role in the fraud also satisfied the "organizer" criteria. Glazer became a Medicare provider in 2007, ER 247-48, and he depended on "making money with Medicare" to earn a living and pay his bills, ER 1152. He then ensured the success of his venture by churning out prescriptions for tests, services, and equipment that were medically unnecessary or never provided. He hired Avetisyan as his office manager, falsified the patients' files to justify

the fraudulent claims, gave cash to Avetisyan to pay the recruiters, funneled the proceeds from the fraud to Avetisyan's Hollywood PS account to keep the scheme going, and controlled how much would be transferred for that purpose. He also monitored the success of the recruiters' efforts and had the ultimate say in which Medicare provider would receive his fraudulent orders, as evidenced by his direction to Minasyan to find "better" patients and that he would try to collect from Medicare "in some different way through a different clinic." ER 517-18.

Glazer challenges the enhancement on substantive and procedural grounds. Substantively, he contends (Br. 51) that the four-level enhancement cannot apply because he did not exercise "control" over Minasyan and did not organize or hire the patient recruiters. That argument fails for two reasons.

First, to qualify as a leader or organizer under Section 3B1.1(a), a defendant need not control all the other participants. *United States v. Camper*, 66 F.3d 229, 231 (9th Cir. 1995) ("To the extent that defendant does play a 'supervisory role' in relation to other participants, he need only exercise authority over one and not all of the other participants in order to merit the adjustment."); *see* U.S.S.G. § 3B1.1, cmt. n.2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.").

More importantly, Glazer did not need to directly "control" anyone as long as he "organized" others to carry out the crime. In *United States v. Ingham*, 486 F.3d 1068, 1076 (9th Cir. 2007), this Court held that "a finding that [the defendant] 'exercised control over others' is superfluous where . . . the defendant organized or led a conspiracy of the scope depicted under U.S.S.G. § 3B1.1(a)." *See also Doe*, 778 F.3d at 823 (to qualify as an "organizer," "there must be evidence that the defendant [1] exercised some control over others involved in the commission of the offense *or* [2] was responsible for organizing others for the purpose of carrying out the crime") (emphasis added; internal quotation marks omitted). The enhancement is therefore appropriate where, as here, a defendant has "the ability and influence necessary to coordinate the activities of others to achieve the desired result, whether or not they have a superior rank in a criminal hierarchy." *Id.* at 824.

Glazer also argues that Avetisyan was the organizer, and he just "'did the medicine.'" Br. 51. But "[doing] the medicine," in his case, meant controlling the tests and services that would be fraudulently submitted to Medicare. In any event, "[t]here can . . . be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, cmt. n.4. Accordingly, the fact that Avetisyan was an organizer or leader does not preclude a finding that Glazer also performed that

117

role. *See, e.g.*, *United States v. Ray*, 735 F. App'x 290, 294 (9th Cir. 2018) (unpublished) (stating that the court has previously held that, "if the record permits, a district court may apply the four-level leadership enhancement to multiple defendants within the same conspiracy"). It also is not determinative that Fifth Avenue may have received a larger share of the proceeds. *See United States v. Dixon*, 901 F.3d 1322, 1348 (11th Cir. 2018) ("[t]here is no requirement that all of the considerations have to be present") (internal quotation marks omitted), *cert. denied*, 139 S. Ct. 854 and 139 S. Ct. 1392 (2019); *cf. Ingham*, 486 F.3d at 1076 (concluding that the record "[left] no doubt" that the four-point increase was warranted based on evidence "sufficient to satisfy five of the seven criteria for a Section 3B1.1(a) enhancement"). Nor is Glazer's comparison of the Medicare proceeds received by his clinic and Fifth Avenue especially apt: although Fifth Avenue received significantly more from Medicare ($4.4 million) than did the Glazer Clinic ($740,820), Avetisyan personally obtained only $859,984 of the Fifth Avenue proceeds. SER 25.

Glazer's procedural argument, raised for the first time on appeal, is that the district court improperly referred to Glazer's control over the trial strategy and repeated dissatisfaction with his attorneys' skills (which came up during in camera hearings) to find that he was the "'shot caller'" in his medical practice. Br. 48-50. As an initial matter, the court concluded that the four-level

enhancement was warranted before it made the challenged statements. Moreover, when read in context, the district court's "observations" responded to Glazer's argument that Avetisyan was the "shot caller" and Glazer merely "did his work." Glazer ER 17. In any event, this Court need not address Glazer's claim that the district court improperly relied on in-camera proceedings because, even without that information, the trial evidence supports the four-level enhancement and Glazer cannot show that the claimed error affected his substantial rights. *See United States v. Pinto*, 48 F.3d 384, 390 (9th Cir. 1995) (finding court's reliance at sentencing on testimony from co-defendant's trial "problematic" but finding no plain error because, in part, other information supported the same conclusion). For the reasons stated above, the district court did not clearly err because other evidence in the record supports an inference that Glazer was one of the organizers of the health care fraud scheme, and that remains true without regard to any information the court gleaned from in camera hearings.

## XI.  If This Court Were To Remand For Further Proceedings, Reassignment Is Not Warranted.

(Glazer Claim F)

Finally, assuming that the case will be remanded, Glazer argues (Br. 52-53) that this Court should reassign the case to a different district judge. His arguments are unpersuasive.

Remand to a different judge is reserved for "rare and extraordinary circumstances." *Krechman v. County of Riverside*, 723 F.3d 1104, 1112 (9th Cir. 2013) (internal quotation marks omitted). This Court considers "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* at 111-12 (internal quotation marks omitted); *see United States v. Johnson*, 812 F.3d 757, 765 (9th Cir. 2016). "The first two factors are equally important and a finding of either is sufficient to support reassignment on remand." *Id.* (internal quotation marks omitted).

Glazer advances three reasons why reassignment is appropriate, but none warrants reassignment. First, he argues that the court relied on evidence outside the record to support the role enhancement. As discussed above, however, the court concluded that the enhancement was warranted from the outset, and the trial evidence supported its finding. The court also imposed a variance sentence that was significantly below the advisory guidelines range, which helps show that the sentence was based on the record and rebuts the

suggestion that the court was unfair. *See* Glazer ER 40 (court finds the guidelines "for this defendant under the present circumstances to be unreasonably harsh"). Thus, even if this Court were to find that the district judge erred by adding the four-level enhancement to Glazer's offense level, there is no reason to believe that the judge could not put that finding "out of his mind," recalculate the advisory guidelines, and sentence Glazer accordingly. *See Johnson*, 812 F.3d at 765 (concluding that judge's comments at sentencing about defendant's credibility and denial of motion for bail pending appeal before defendant could file a reply "did not demonstrate personal bias or suggest that the judge would have substantial difficulty putting out of his mind any previously expressed erroneous views").

Glazer cites *United States v. Berzon*, 941 F.2d 8 (1st Cir. 1991), but that case does not help him. In *Berzon*, the sentencing court was aware of undisclosed – and significant – information from a co-defendant's trial about Berzon's role in the offense. *Id.* at 16-17. The court of appeals remanded the case to the original sentencing judge to determine whether the judge had materially relied on that information. *Id.* at 20. If the sentencing judge answered in the affirmative, the court of appeals directed that the judgment be vacated and, "[c]onsistent with its practice" when resentencing is required, remanded to a different judge for resentencing. *Id.* Here, of course, Glazer

knew of the information in the sealed proceedings because he was there. Nor was "notice" required because the district court's "observations" merely responded to Glazer's argument at sentencing. *See United States v. Rivera-Rodriguez*, 489 F.3d 48, 55 (1st Cir. 2007) (distinguishing *Berzon* and noting that the sentencing court's mention of testimony from co-defendants' trial "was responding to defense counsel's argument that her client was a 'peripheral supplier,' who had supplied only small amounts of cocaine"). And, unlike the First Circuit, this Court does not reassign cases when resentencing is required as a matter of course. *See United States v. Acosta-Chavez*, 727 F.3d 903, 910 (9th Cir. 2013) (absent unusual circumstances, resentencing is to be done by the original sentencing judge).

Relatedly, Glazer argues (Br. 53) that the court breached its "promise of confidentiality" when it offered its "observations" to counter Glazer's argument that he was not the "shot caller" in his medical practice. That claim is unsupported. The court primarily focused on Glazer's conduct during trial, Glazer ER 17-18, and even its brief reference to Glazer's dissatisfaction with his previous attorneys' skill did not reveal anything that was not apparent from the repeated substitutions of counsel themselves.

Finally, Glazer relies on the court's "aggressive questioning." But as demonstrated above, there were relatively few instances when the court

intervened, its questioning appropriately focused on clarifying the evidence, and, even if an individual comment was best left unsaid, the comments did not reflect personal bias. *Cf. Krechman*, 723 F.3d at 1112 (agreeing with defendant that judge "made several off-color comments that may not have been well-received," but concluding that "the record does not suggest that [the judge] was unfair").

Reassignment, on the other hand, would entail significant waste or duplication of effort because the district judge has already presided over a trial and decided numerous pre-trial matters. *See United States v. Kowalczky*, 805 F.3d 847, 861 (9th Cir. 2015) (noting that "[c]onsiderations of judicial efficiency further counsel against reassignment. Given the lengthy procedural history of this case, remanding the case to a different judge would entail waste and duplication disproportionate to any appearance of unfairness that may exist in this case.").

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgments.

Respectfully submitted,

EMILY Z. CULBERTSON
ROBYN N. PULLIO
CLAIRE YAN
Trial Attorneys
Fraud Section, Criminal Division

BRIAN C. RABBITT
Acting Assistant Attorney General

/s/Kirby A. Heller
KIRBY A. HELLER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1263
Washington, D.C. 20530
(202) 307-0085
kirby.heller@usdoj.gov

## CERTIFICATE OF COMPLIANCE
## WITHTYPEFACE AND LENGTH LIMITATIONS

1.      This brief contains 27,986 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(f). The government has filed a motion

requesting approval to file an oversized brief.

2.      This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in proportionally spaced, 14-point serif typeface

using Microsoft Office Word.

/s/Kirby A. Heller
KIRBY A. HELLER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1263
Washington, D.C. 20530
(202) 307-0085

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 6, 2020. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Kirby A. Heller
KIRBY A. HELLER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1263
Washington, D.C. 20530
(202) 307-0085